# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1129

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Sally Ann Hodge, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 22, 2009
Filed: December 7, 2009

_____

Before MURPHY, JOHN R. GIBSON, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

A grand jury indicted Sally Ann Hodge (Hodge), a paramedical examiner, on twenty counts of wire fraud in violation of 18 U.S.C. § 1343. The indictment charged Hodge with submitting fraudulent reimbursement claims for life insurance health examinations Hodge had never performed. Hodge pled guilty to Count 1 of the indictment pursuant to a plea agreement. The district court[1] determined the amount of loss attributable to Hodge exceeded $200,000 and imposed a 12-level enhancement

_____

[1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

pursuant to U.S.S.G. § 2B1.1(b)(1)(G) (2007). The district court sentenced Hodge to 21 months imprisonment and ordered her to pay $236,297.70 in restitution. We affirm.

## I.    BACKGROUND

American National Insurance (ANI), a Texas corporation, was in the business of providing life insurance. ANI required certain life insurance applicants to obtain health examinations. To coordinate the health examinations, ANI contracted with two third-party administrators, Examination Management Services, Inc. (EMSI) and Hooper Holmes (Hooper). EMSI contracted with another third-party administrator, Health Masters, and Health Masters and Hooper acted as intermediaries between ANI and Paramed Solutions (Paramed). Paramed was a Colorado corporation that arranged the health examinations for people applying for life insurance from ANI. Paramed contracted with paramedical examiners to conduct the health examinations of the life insurance applicants, including blood and urine testing.

Hodge worked in the St. Louis, Missouri, area, and was one of the paramedical examiners who provided services to Paramed. Hodge submitted her payment requests to Paramed electronically by logging onto the Paramed website with a unique login name and password and filling out a payment request form. Hodge was required to fill out a separate payment request form for each life insurance applicant she examined. The information on the forms included: (1) the applicant's name, address, telephone number, date of birth, and social security number; (2) the date of the health examination; (3) the type of examination and testing; (4) the name of the clinical laboratory that analyzed the specimens; (5) the insurance company; and (6) the insurance agent. Each of Hodge's requests originated from the email account "sally165@netzero.net," which belonged to Hodge. Paramed paid Hodge between $30 and $100 for each payment request, depending on the type of examination. Once Paramed paid Hodge, Paramed would then bill Hooper or Health Masters. Health

Masters would bill EMSI, and EMSI and Hooper, in turn, billed ANI for the examinations.

George Marchand, an employee of ANI, discovered ANI had paid Hooper and EMSI for 1,762 health examinations for which there were no corresponding insurance applications or documentation. Paramed learned of the fraudulent submissions and identified Hodge as having submitted each of the 1,762 health examinations at issue. When confronted, Hodge claimed she had completed all of the health examinations and would provide copies of her documentation. Hodge never did so.

Paramed examined about 50 of the 1,762 submissions and discovered fraudulent information. Paramed then sent the bar codes listed on 253 of the 1,762 disputed payment request forms to the identified testing lab, Clinical Reference Laboratory (CRL). The bar codes were used to identify the laboratory specimens associated with a particular insurance applicant. CRL found no record of receiving specimens from the 253 individuals identified by the bar codes. Additionally, no record could be found for six of the eight ANI insurance agents listed in the 1,762 fraudulent submissions. The other two insurance agents did exist, but neither ANI agent knew Hodge and neither had referred life insurance applicants to her.

Federal Bureau of Investigations Special Agent David Herr (Agent Herr) investigated 20 of the 1,762 fraudulent submissions. Agent Herr could find no state or federal record that any of the 20 individuals named in the submissions ever existed, and in many cases, the social security numbers identified in the submissions had never been issued by the Social Security Administration. Based on Agent Herr's investigation, a grand jury indicted Hodge on 20 counts of wire fraud on September 13, 2007. On February 12, 2008, pursuant to a plea agreement, Hodge pled guilty to the first count of the indictment.

Following Hodge's guilty plea, Agent Herr randomly selected an additional 100 submissions to investigate. Agent Herr selected the 100 submissions by stacking all of the submissions and randomly pulling submissions from the stack. Agent Herr learned this selection method in a college accounting class. Like the initial 20 submissions, Agent Herr found no record of any individuals corresponding to the names and social security numbers listed on the submissions and determined the Social Security Administration had never issued many of the social security numbers.

Before Hodge was sentenced, a United States Probation Officer prepared a presentence investigation report (PSR) for the district court. The PSR calculated a base offense level of 7 and recommended a 12-level enhancement based on the government's loss calculation of $243,275.10. The PSR also recommended a 3-level reduction for acceptance of responsibility, which resulted in a total offense level of 16. Hodge objected to various portions of the PSR, including the PSR's calculation of loss and recommendation of a 12-level loss enhancement.

The district court convened Hodge's sentencing hearing on June 12, 2008. The government presented testimony from Agent Herr, as well as employees and officers of Paramed, Hooper, Health Masters, EMSI, and CRL. After the government presented its loss calculation evidence, the district court continued the sentencing hearing and requested proposed findings of fact and conclusions of law from the parties.

The sentencing hearing resumed on August 20, 2008. The district court adopted the government's proposed fact findings, found the government proved by a preponderance of the evidence that the amount of loss was $236,297.70,[2] and applied

---

[2]The government adjusted its initial loss calculation from $243,275.10 to $236,297.70 after the first sentencing hearing.

a 12-level offense level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(G).[3] The district court sentenced Hodge to 21 months imprisonment, the bottom of Hodge's advisory United States Sentencing Guidelines (Guidelines) range, and ordered her to pay $236,297.70 in restitution. Hodge appeals.

## II.    DISCUSSION

Hodge contends the district court erred in its loss calculation. "We review the district court's interpretation of loss as used in the Guidelines de novo, and its calculation of loss for clear error." United States v. Fazio, 487 F.3d 646, 657 (8th Cir. 2007) (citation omitted). "The district court's method for calculating the amount of loss must be reasonable, but the loss need not be determined with precision." United States v. McIntosh, 492 F.3d 956, 960-61 (8th Cir. 2007) (internal marks and citations omitted). We will affirm the district court's calculation "unless it is not supported by substantial evidence, was based on an erroneous view of the law, or [we have] a firm conviction that there was a mistake after reviewing the entire record." United States v. Theimer, 557 F.3d 576, 578 (8th Cir. 2009) (citing Fazio, 487 F.3d at 657-58). The government must prove the amount of loss attributable to a defendant by a preponderance of the evidence. See United States v. Hansel, 524 F.3d 841, 847 (8th Cir. 2008) (stating the government must prove the facts supporting a sentencing enhancement by a preponderance of the evidence); McIntosh, 492 F.3d at 961 (noting the burden is on the government to prove the loss attributable to a defendant).

Hodge first argues the government failed to establish by a preponderance of the evidence that Hodge submitted all 1,762 fraudulent claims. Next, Hodge insists the government's investigation of the fraudulent submissions was insufficient and failed to demonstrate each of the 1,762 submissions actually was fraudulent. Finally, Hodge

---

[3]U.S.S.G. § 2B1.1(b)(1)(G) provides for a 12-level increase in offense level when a defendant commits certain specified crimes, as well as crimes involving fraud or deceit, and the loss attributable to the defendant is greater than $200,000, but less than $400,000.

claims the district court erred in its calculation of loss because the evidence showed Hodge's income from Paramed was only $162,799.21, not $236,297.70. She claims, at most, the loss attributable to her is the loss associated with the 120 fraudulent submissions Agent Herr actually investigated.

We reject Hodge's arguments. We conclude the district court did not clearly err in finding the government presented sufficient evidence to establish a nexus between Hodge and each of the 1,762 fraudulent submissions. Hodge concedes she is responsible for the 20 fraudulent submissions identified in the indictment. Like the 20 submissions in the indictment, each of the remaining 1,742 fraudulent submissions were submitted by Hodge's email account, using Hodge's unique login and password. The evidence showed, when Paramed first confronted Hodge about the fraudulent submissions, Hodge insisted she had completed all of the health examinations.[4] Each of the 1,762 fraudulent submissions was presented to Paramed for payment from Hodge's email account, listed ANI as the insurance company, and named one of eight different insurance agents. While the government may not have independently investigated each of the 1,762 submissions, there were striking similarities between the 20 charged submissions and the remaining 1,742 uncharged submissions. See United States v. Radtke, 415 F.3d 826, 841 (8th Cir. 2005) (citing U.S.S.G. § 1B1.3(a)(2)) ("Relevant conduct under the guidelines need not be charged to be considered in sentencing, and it includes all acts and omissions 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'").

---

[4]Hodge's early insistence that she had actually performed all 1,762 examinations contradicts her present position that someone other than Hodge may have entered the fraudulent submissions using Hodge's login and password due to a "financial motive or grudge." We consider it unlikely that another party with some unexplained financial motive or grudge would submit the fraudulent claims, knowing Hodge was the person who would profit financially from the fraudulent submissions. There was also no evidence Paramed somehow knew of or was involved in the scheme.

We are also persuaded the district court did not clearly err in finding the government presented sufficient evidence establishing the 1,762 submissions at issue were fraudulent. Each of the submissions listed ANI as the insurance company, but ANI had no applications or documentation for any of the 1,762 submissions. Of the eight insurance agents listed in the submissions, six could not be found in ANI's database and were not registered ANI agents. The two bona fide ANI agents never heard of Hodge and had not referred insurance applicants to her. Thus, each of the 1,762 submissions contained two materially false statements, supported by corroborating evidence. Of the 120 fraudulent submissions Agent Herr thoroughly investigated, Agent Herr could not find any federal or state record that any of the 120 individuals named in the submissions ever existed. Paramed's internal investigation of about 50 of the submissions similarly revealed each of the 50 submissions were fraudulent. In addition, CRL could find no record of receiving specimens from any of the 253 submissions sent by Paramed to CRL, even though CRL was identified as the laboratory on each of the submissions. We conclude the district court did not clearly err in its determination.

Finally, Hodge argues the district court clearly erred in calculating the loss attributable to her. Hodge bases her argument on the fact she was paid only $162,799.21 from Paramed, and not $236,297.70, the amount of loss the district court found attributable to Hodge. We disagree.

The amount of loss need not be determined with precision. See McIntosh, 492 F.3d at 960-61. Instead, the "[district] court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). "The estimate of the loss shall be based on available information, taking into account [various factors], as appropriate and practicable under the circumstances." Id. We afford the district court deference because the district court "is in a unique position to assess the evidence and estimate the loss based upon that evidence." Id.

The evidence in this case established that ANI paid $236,297.70 for the 1,762 fraudulent health examinations between January 2004 and January 2006. Hooper, EMSI, Health Masters and later Paramed each deducted portions from this $236,297.70 as payment for their services. After these deductions, the amount of money that trickled down to Hodge amounted to $162,799.21. When the fraud was discovered, Hooper had to reimburse ANI for the fraudulent health examinations in the amount of $100,579.00. Similarly, EMSI refunded $140,718.70 to ANI. EMSI was able to recoup $120,270.15 from Health Masters, but EMSI ultimately suffered a loss of $15,448.55. Health Masters consequently lost $120,270.15. The combined total loss for EMSI, Health Masters and Hooper was $236,297.70. The government presented evidence that the losses suffered by Hooper, EMSI and Health Masters were directly caused by Hodge's actions. Because we conclude the district court's loss calculation was reasonable, was supported by substantial evidence, and was not based on an erroneous view of the law, we affirm. See Theimer, 557 F.3d at 578.

## III.    CONCLUSION

For the reasons stated in this opinion, we affirm the district court's judgment and Hodge's sentence.

_____