# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3104

_____

United States of America,

        Appellee,

v.

Christian Quevedo,

        Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Nebraska.
\*
\*
\*

_____

Submitted: May 10, 2011
Filed: September 8, 2011

_____

Before MURPHY, BEAM, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

After a jury trial, Christian Quevedo was convicted of ten counts of submitting false claims against the United States and one count of conspiracy to defraud the United States with respect to claims. The district court sentenced him to forty-six months' imprisonment on each count, to run concurrently, and three years' supervised release. The court also ordered Quevedo to pay restitution. Quevedo appeals his conviction and sentence, and we affirm.

## I.

Quevedo is a native and citizen of Peru. He entered the United States in 2003, on a visa that allowed him to work and attend school. He later moved to Lincoln, Nebraska, where he attended the University of Nebraska. There Quevedo made contact with other Peruvians, including Carlos Carpio, who had attended school with Quevedo in Peru.

On October 21, 2009, a grand jury charged Quevedo and Carpio with one count of conspiracy to defraud the United States with respect to claims, in violation of 18 U.S.C. § 286, and sixteen counts of submitting false claims against the United States, in violation of 18 U.S.C. § 287. The indictment alleged that Quevedo and Carpio filed sixteen fraudulent tax returns – two on behalf of Quevedo, two on behalf of Carpio, and twelve on behalf of others. According to the indictment, the tax returns listed inflated figures for both income earned and federal income tax withheld, and as a result, the returns claimed refunds larger than those to which the filers were entitled. Carpio pleaded guilty to the conspiracy count in exchange for dismissal of the other counts. Quevedo proceeded to trial.

Five Peruvians, in whose names six of the returns were filed, testified at trial: Ana Chirinos, Doris Jara, Michela Perleche, Pamela Pizzaro, and Jhonattan Sanchez. Each of the Peruvians had spent time in the United States, either as a student at a American college or university, or through an exchange program while attending a university in Peru. Each also had worked in the United States – Sanchez in 2005; Chirinos, Jara, and Pizzaro in 2006; and Perleche in 2005 and 2006. Thus, each Peruvian was required to file one or more federal income tax returns.

Jara, Perleche, and Sanchez lived in Lincoln, and were friends with Quevedo. They testified that Quevedo offered to help them file their tax returns. They gave Quevedo their Social Security Numbers and Form W-2s from the relevant years, and

some time later each received a payment from Quevedo that he claimed was a tax refund. Chirinos and Pizzaro did not know Quevedo. They testified that they did not try to file their tax returns until after they had returned to Peru. When they sought assistance with filing their tax returns, they were referred by friends to Carpio. Pizarro testified that she sent her Social Security Number and W-2s to Carpio, and that six months later, Carpio told her that she could retrieve her refund from a certain bank. Chirinos testified that she sent her Social Security Number and W-2s to Carpio, and that Carpio told her that a company called Actax would file her return. She later received a payment that she believed was a tax refund.

Following its case-in-chief, the government successfully moved to dismiss six of the sixteen false claims counts; these counts did not involve returns filed on behalf of Quevedo, Carpio, or the five Peruvians who testified at trial. The jury found Quevedo guilty on the remaining counts. The district court sentenced him to forty-six months' imprisonment on each count, to run concurrently, and three years' supervised release. The court also ordered that Quevedo pay restitution in the amount of $79,796 – the sum of refunds the IRS paid on the fraudulent returns before it discovered the scheme and stopped paying.

## II.

### A.

On appeal, Quevedo challenges the sufficiency of the evidence to support his convictions. A person commits the offense of conspiracy to defraud the United States with respect to claims if he "enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim." 18 U.S.C. § 286. A person makes a false claim against the government if he "makes or presents" to any department or agency of the United States "any claim upon or against

the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent." *Id.* § 287. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the verdict, and we will overturn a conviction only if no reasonable jury could find Quevedo guilty beyond a reasonable doubt. *United States v. McCraney*, 612 F.3d 1057, 1063 (8th Cir. 2010), *cert. denied*, 131 S. Ct. 1784 (2011).

Quevedo argues that the government presented no evidence that he ever filed any income tax return, including his own. He cites his own testimony that a woman named Amanda Martinez filed his tax returns, that she paid Quevedo to refer to her other Peruvians who needed help with their tax returns, and that Quevedo gave Martinez access to his Paypal account when she had trouble sending refunds to other Peruvians. Quevedo contends that his explanation for the returns demonstrates that there was insufficient proof for the jury to find him guilty of any count.

The evidence at trial, however, permitted a different conclusion. Quevedo's false claims convictions were based on ten fraudulent tax returns. Each of the ten returns was filed electronically from one of four Internet protocol addresses that was also used, at around the same time the returns were filed, to access Quevedo's Paypal account through Quevedo's e-mail address. Paypal is a company that allows users to create and maintain accounts for the purpose of transferring money over the Internet. Seven of the returns were filed through Quevedo's e-mail address and instructed the IRS to deposit any refunds into bank accounts that belonged to Quevedo.

The other three returns were filed through Carpio's e-mail address. Two of them instructed the IRS to deposit any refund into Quevedo's accounts. On the same day that the refund for the third return was deposited into a bank account belonging to Carpio, a sum identical to the refund was withdrawn from Carpio's bank account and placed in Quevedo's Paypal account. Three Peruvians – Jara, Perleche, and

Sanchez – testified that Quevedo told them that he would file their tax returns, and two of the returns were filed on Quevedo's own behalf.

Based on this evidence, the jury reasonably rejected Quevedo's testimony that Amanda Martinez filed the returns. There was sufficient evidence to show that Quevedo filed each of the ten tax returns and committed the charged offenses.

## B.

Quevedo also appeals his sentence, arguing that the district court committed procedural error when calculating the advisory guideline range. He argues that the court incorrectly applied two specific offense characteristics: one based on the amount of loss caused by Quevedo's offenses, and another based on the number of victims of his offenses. *See* USSG § 2B1.1(b)(1)(G), (b)(2)(A)(i). We review the district court's interpretation of the sentencing guidelines *de novo*, and its factual findings for clear error. *United States v. Willett*, 623 F.3d 546, 548 (8th Cir. 2010).

We first consider the amount of loss. The base offense level for a defendant convicted under 18 U.S.C. §§ 286 or 287 is determined by USSG § 2B1.1. That section also provides for a specific offense characteristic based on the amount of loss that resulted from the defendant's offense. *Id.* § 2B1.1(b)(1).

"[L]oss" is defined as "the greater of actual loss or intended loss." *Id.* § 2B1.1 comment. (n.3(A)). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense," including "pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 comment. (n.3(A)(i)-(ii)). "'Pecuniary harm'" is "harm that is monetary or that otherwise is readily measurable in money," which "does not include emotional distress, harm to reputation, or other non-economic harm." *Id.* § 2B1.1 comment. (n.3(A)(iii)).

A sentencing court must include in its calculation any losses caused by "relevant conduct." This includes, *inter alia*, charged and uncharged conduct that was "part of the same course of conduct or common scheme or plan as the offense[s] of conviction." *See* USSG § 1B1.3(a)(2); *see also United States v. McIntosh*, 492 F.3d 956, 960-61 (8th Cir. 2007). The government has the burden of proving the amount of loss attributable to a defendant by a preponderance of the evidence. *United States v. Hodge*, 588 F.3d 970, 973 (8th Cir. 2009).

A presentence investigation report ("PSR") prepared after Quevedo's trial calculated the intended loss from Quevedo's offenses as $247,019, and the actual loss as $79,796. To determine the intended loss, applying principles of relevant conduct, the PSR added the following sums: the refunds claimed by the ten tax returns that were the basis for Quevedo's false claims convictions, the refunds claimed by the six tax returns that were the basis for the six dismissed false claims counts, and the refunds claimed by fourteen additional tax returns. To determine the actual loss, the PSR added the refunds paid on those returns before the government discovered Quevedo's scheme and stopped paying the refunds.

After noting that the offenses of conviction must be "grouped" pursuant to USSG § 3D1.2(d), the PSR recommended that the district court calculate an actual or intended loss of greater than $200,000 but not greater than $400,000. According to USSG § 2B1.1(b)(1)(G), the recommended loss amount would result in a twelve-level specific offense characteristic.

Quevedo objected to the PSR's loss calculation and the factual statements underlying the calculation. In response, the government presented the testimony of IRS Special Agent Terresa Lato. The government also offered a summary exhibit that set forth relevant information about each of the thirty tax returns. Based on this evidence, the district court overruled Quevedo's objection to the amount of loss, and applied the twelve-level adjustment set forth in § 2B1.1(b)(1)(G).

On appeal, Quevedo first challenges the district court's decision to include in its calculation of intended loss the refunds claimed by seven of the fourteen uncharged tax returns. Special Agent Lato admitted at the sentencing hearing that neither she nor anyone else from the IRS talked to the six individuals in whose names those returns were filed. Quevedo contends that the government therefore failed to prove by a preponderance of the evidence that the refunds claimed on the returns were part of the intended loss.

We see no error in the court's consideration of the seven disputed returns. Uncharged offenses may be considered at sentencing as relevant conduct if they are part of the same course of conduct or common scheme or plan as the offenses of conviction. USSG § 1B1.3(a)(2). Where the uncharged offenses are substantially connected to the charged offenses by a "similar *modus operandi*," then they qualify as relevant conduct. *Id.* § 1B1.3, comment. (n.9(A)). The government presented evidence that the refund claimed on each of the thirty returns on which the district court based its loss calculation – including the seven to which Quevedo objects – was to be deposited into a bank account belonging to either Quevedo or Carpio. All but one of the returns was filed using either Quevedo's or Carpio's e-mail address. All the returns claimed similar large deductions for medical expenses, moving expenses, and unreimbursed employee expenses. Each of the returns listed employers for which the filer had never worked, and five of the seven challenged returns named false employers that also were listed on one or more of the other twenty-three returns. This evidence was sufficient for the district court to find that the seven challenged returns were part of the same course of conduct as the offenses of conviction, and to include them as relevant conduct.

Quevedo also argues that the district court should have reduced the intended loss figure by the amount of legitimate tax refunds to which he and some of the Peruvian filers were entitled. He notes that Special Agent Lato testified that at least one of the two tax returns that Quevedo filed on his own behalf included both real

-7-

income and false income, and that Quevedo may therefore have been entitled to some portion of the tax refund that he claimed in the return. She also testified that some of the Peruvians would have received refunds if they had they filed accurate tax returns. Each of the five Peruvians who testified during trial stated that he or she received a sum of money, which each understood to be a refund, after Quevedo or Carpio filed his or her tax return. Quevedo argues that the district court erred by calculating the intended loss without considering the legitimate income included on the tax returns, and the "refunds" that he and Carpio paid to the Peruvians. *Cf.* USSG § 2B1.1 comment. (n.3(F)(ii) ("In a case involving government benefits . . . , loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.").

Assuming for the sake of analysis that the loss figure should have been reduced by the amount of legitimate refunds, any error was harmless. Special Agent Lato testified during the sentencing hearing that only some of the Peruvians were entitled to a legitimate refund. She also said that any refund to which those Peruvians were entitled was "small." The largest payment that any of the five Peruvians who testified at trial received from Quevedo or Carpio was $737. And the two tax returns that Quevedo filed on his own behalf claimed refunds of only $979 and $1,753.

These numbers show that a reduction in the loss amount based on legitimate refunds would not have changed Quevedo's guideline range. The twelve-level specific offense characteristic applies if the loss is greater than $200,000, *see* USSG § 2B1.1(b)(1)(G), and the district court found a loss amount of $247,019. The record does not support a set-off for legitimate refunds that exceeds $47,019. Even if *all* of the Peruvian filers, other than Quevedo and Carpio, were entitled to a "small" refund that equaled the *largest* of the refunds paid to the five Peruvian trial witnesses ($737) on each of the twenty-six returns filed in their names, the total set-off would have

been only $19,162. Adding the refunds that Quevedo claimed on his own returns would increase the set-off by $2,732 to a grand total of $21,894. Quevedo thus suffered no prejudice from the asserted error.

Quevedo also challenges the district court's application of a two-level specific offense characteristic for an offense involving ten or more victims. *See* USSG § 2B1.1(b)(2)(A)(i). A "victim," as relevant here, means "any person who sustained any part of the actual loss determined under [USSG § 2B1.1(b)(1)]." *Id.* § 2B1.1 comment. (n.1). Actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, comment. (n.3(A)(i)). The district court concluded that Quevedo's offenses involved more than ten victims for three reasons: first, because the Peruvians who are not United States citizens are potentially precluded from earning a living in the United States as a result of the false tax returns filed in their names; second, because some of the Peruvians likely would have been entitled to a refund if a legitimate return had been filed; and third, because the "default position" of the IRS is to hold the Peruvians responsible for the fraudulent returns until they prove that they were not responsible for the fraud.

We conclude that the district court's first and third rationales are sufficient to sustain the finding, and we need not consider the second. Agent Lato testified that several of the Peruvians expressed a desire or willingness to return to the United States, and that the false claims filed in their names by Quevedo would be "an issue" in the immigration process. Because their records with the IRS will show money due from the taxpayers to the IRS, the Peruvians would face a "long drawn-out process" to establish that they filed no false claims, owe no money, and should be permitted to reenter the United States. The district court did not clearly err in finding that the future adverse effect of battling the bureaucracy is a reasonably foreseeable pecuniary harm to the victims: time is money. *United States v. Abiodun*, 536 F.3d 162, 168-69 (2d Cir. 2008). And given that the twenty-four Peruvian filers had entered the United States to work or study at a young age, and several who were available for interview

by the IRS expressed a desire or willingness to return, it was not clear error to find that ten or more suffered this actual loss. The district court reasonably found that this loss was reasonably foreseeable by Quevedo, especially given Quevedo's status as an alien who is familiar with the procedures for entering the United States.

Strictly speaking, the guideline commentary states that a "victim" is one who sustained any part of the "actual loss determined" under USSG § 2B1.1(b)(1). USSG § 2B1.1, comment. (n.1); *United States v. Skys*, 637 F.3d 146, 155 (2d Cir. 2011). The district court had no need to determine actual loss under § 2B1.1(b)(1): the intended loss clearly exceeded the actual loss, and the guidelines call for use of the greater amount. USSG § 2B1.1, comment. (n.3(A)). But the court did specifically find that the Peruvians counted as victims were "out real money," S. Tr. 31, meaning that they suffered actual loss. *Cf. United States v. Icaza*, 492 F.3d 967, 969-70 (8th Cir. 2007). Quevedo was not prejudiced by the court's failure to make a formal determination of "actual loss" under § 2B1.1(b)(1). The amount was unnecessary to the guideline calculations, and the court otherwise found that ten or more Peruvians were victims who suffered reasonably foreseeable pecuniary harm.

\*       \*       \*

The judgment of the district court is affirmed.

_____

-10-