# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3256

_____

United States of America,             *
                                      *

       Appellee,            *
                                      *   Appeal from the United States

       v.                    *   District Court for the
                                      *   Northern District of Iowa.

Robert Miell,                  *
                                      *

       Appellant.           *

_____

Submitted:   September 20, 2011
Filed:   November 25, 2011

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Robert Miell appeals his sentence on mail fraud charges under 18 U.S.C. § 1341. Miell claims that the district court[1] erred when applying sentencing guidelines enhancements for (1) abuse of position of private trust, (2) 250 or more victims, and (3) loss exceeding $1 million. Because the district court did not clearly err by applying these enhancements, we affirm.

_____

[1] The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

I.

Miell, a landlord and owner of hundreds of rental properties, pleaded guilty to engaging in two mail fraud schemes.[2] The first targeted his insurance company (the insurance fraud scheme). The second targeted his tenants by systematically and fraudulently retaining their damage deposits—after inflating the costs of repairs on tenants' "Summary of Move-Out Work" forms—and demanding additional alleged repair costs from tenants (the damage deposit scheme).

At sentencing, the district court concluded that Miell's total offense level for the damage deposit scheme was 35, with a Criminal History Category of I, for a United States Sentencing Guidelines (Guidelines or U.S.S.G.) range of 168 to 210 months' imprisonment. In calculating the offense level, the district court applied a two-level enhancement for abuse of position of private trust, a six-level enhancement for the offense involving 250 or more victims, and a sixteen-level enhancement for the victims' losses exceeding $1 million. The district court varied upward to 240 months, the statutory maximum for the mail fraud offenses, based on the factors set forth in 18 U.S.C. § 3553(a).[3]

---

[2]Miell pleaded guilty to eighteen counts of mail fraud under 18 U.S.C. § 1341, one count of perjury under 18 U.S.C. § 1621, and one count of false declaration before a court under 18 U.S.C. § 1623. He was found guilty at trial of two counts of filing a false tax return under 26 U.S.C. § 7206(1).

[3]Counts 7 through 18 of the Third Superseding Indictment, arising from the damage deposit scheme, were grouped together. The district court also sentenced Miell to 240 months for the counts arising from the insurance fraud scheme (Counts 1 through 6), 60 months for the perjury and false declaration charges (Counts 19 and 20), and 36 months for the false tax return charges (Counts 22 and 23), all to be served concurrently, along with other terms and conditions.

II.

"We review the district court's construction and application of the sentencing guidelines *de novo*." United States v. Fiorito, 640 F.3d 338, 350 (8th Cir. 2011). We review for clear error the district court's findings of fact regarding the abuse of position of trust, number of victims, and amount of loss sentencing enhancements. See United States v. Fazio, 487 F.3d 646, 659 (8th Cir. 2007) (abuse of position of trust); United States v. Icaza, 492 F.3d 967, 969 (8th Cir. 2007) (number of victims); United States v. McKanry, 628 F.3d 1010, 1019 (8th Cir. 2011) (amount of loss).

A.

Under U.S.S.G. § 3B1.3, the government must prove two elements by a preponderance of the evidence in order for the abuse of trust enhancement to apply: (1) defendant occupied a position of private trust, and (2) defendant used this position in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3; see also United States v. Olson, 22 F.3d 783, 786 (8th Cir. 1994) (quoting United States v. Brelsford, 982 F.2d 269, 271 (8th Cir. 1992)). The application of U.S.S.G. § 3B1.3 "is fact intensive because it turns on the precise relationship between the defendant and her victims and therefore cannot be decided on the basis of generalities." United States v. Jenkins, 578 F.3d 745, 753 (8th Cir. 2009) (quoting United States v. Baker, 200 F.3d 558, 564 (8th Cir. 2000)).

Miell contends that the landlord-tenant relationship is not a position of private trust. A position of private trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n.1. Except for the district court in this case, no court has ruled on whether a landlord is in a position of private trust to tenants concerning damage deposits under U.S.S.G. § 3B1.3. We have, however, found

-3-

similar relationships to constitute positions of private trust. See, e.g., Fazio, 487 F.3d at 659 (realtor-client); United States v. Anderson, 349 F.3d 568, 573-74 (8th Cir. 2003) (investment advisor-client); Baker, 200 F.3d at 564 (licensed insurance agent-client); see also Guarracino v. Hoffman, 246 B.R. 130, 134 (Bankr. D. Mass. 2000) (noting that a trust relationship exists between landlord and tenant with respect to security deposits); Brixius v. Christian (In re Christian), 172 B.R. 490, 497-98 (Bankr. D. Mass. 1994) (recognizing fiduciary relationship between a landlord and tenant with respect to security deposits).

We conclude that, in light of the circumstances, the district court did not err in finding that Miell occupied a position of trust vis-a-vis his tenants regarding their damage deposits.[4] Miell was required by Iowa law to hold his tenants' deposits in a federally insured bank account or trust account separate from his personal funds and to return each rental deposit minus legitimate costs within thirty days after termination of each tenancy. Iowa Code § 562A.12. He retained substantial discretionary judgment while occupying the highest management position in his companies, a position that afforded him the opportunity to access tenants' apartments and money, exercise control over damage deposits and documentation regarding alleged damages, and choose the means of repairs. The tenants were incapable of monitoring Miell in these undertakings, and traditional paths of legal recourse were relatively fruitless considering the costs of litigation. Moreover, the deposits were a prerequisite to housing for the tenants, who often were economically vulnerable, unsophisticated, and thus—unlike large commercial tenants—unable to negotiate a better deal. See In re Christian, 172 B.R. at 498 (recognizing that landlord-residential tenant relationship only seldomly is "a relation at arm's length between equals").

---

[4]It appears that the district court would have imposed the same sentence without the abuse of trust enhancement, as the court found that the two-level enhancement "does not even begin to correlate to the nature and extent of the harm that Miell's scheme inflicted on people that he expected would be too economically vulnerable or unsophisticated to do anything about it." D. Ct. Order of Sep. 27, 2010, at 92.

Miell also used his essentially unreviewable position of authority to facilitate and conceal his fraud, as his possession of the deposits put him in a position of power relative to tenants. His possession of tenants' rental units following tenants' departures, along with control of paperwork itemizing the costs of repairs, enabled him to commit and conceal the fraud by inflating repair costs and doctoring or destroying the applicable records. Because tenants did not repair the rental units, they lacked first-hand knowledge about the actual costs of such repairs and had to rely to an extent on Miell's representations regarding repairs and costs. Those representations ordinarily are given considerable deference: Miell, the fourth-largest property owner in Linn County, Iowa, controlled the property and records, and the tenants—many of whom, as noted above, were unsophisticated and economically disadvantaged—faced significant costs and barriers to challenging Miell's representations concerning the damage deposits.

Miell further argues that the district court erred by finding that he held a position of trust because his tenants did not in fact trust him. Whether a defendant holds a position of trust with respect to a victim, however, turns on the nature of the defendant's position and amount of discretion and control relative to the victim, not whether the victim subjectively trusted the defendant. See United States v. Santoro, 302 F.3d 76, 81-82 (2d Cir. 2002) (rejecting argument that defendant could not have abused position of trust because clients did not trust him); see also United States v. Bailey, 227 F.3d 792, 802 (7th Cir. 2000) (noting that U.S.S.G. § 3B1.3 enhancement does not require victim's subjective belief that defendant occupies position of trust).

B.

Miell appeals the application of a six-level enhancement under U.S.S.G. § 2B1.1(b)(2)(C) for a crime affecting 250 or more victims. He concedes that 140 tenants were victims but disputes the existence of any additional victims.

"If a defendant objects to factual statements in a PSR, then the sentencing court may not rely on those facts unless the government proves them by a preponderance of the evidence." United States v. Replogle, 628 F.3d 1026, 1029 (8th Cir. 2011) (citing United States v. Poor Bear, 359 F.3d 1038, 1041 (8th Cir. 2004)). The Final Amended Presentence Investigation Report (PSR) listed 272 individuals who were identified, or came forward following a newspaper notice, as victims of the damage deposit fraud scheme and who submitted victim impact statements reporting a specific loss. Miell objected to the count being more than 250, arguing that a majority of the 272 claiming a loss "provide[d] no documentation or supporting reason for their alleged loss sustained . . ." Objections of Def. to PSR at ¶ 99. Miell did not object, however, with respect to any particular victim's reported loss. Nor did he object to the factual section of the PSR detailing the systematic nature of his damage deposit fraud scheme.

Miell's admissions concerning the systematic nature of his fraud scheme, together with the evidence presented at his sentencing hearings, constituted evidence sufficient to establish by a preponderance of the evidence that the above-mentioned 272 individuals were victims. Miell's failure to challenge the characterization of any specific tenant identified as a victim negates his challenge concerning the number of victims. See United States v. Hatchett, 622 F.3d 984, 987 (8th Cir. 2010) (holding that the government was not required to present direct evidence about circumstances of each alleged victim to establish number of victims in the absence of a challenge to the characterization of any specific investor as a victim); see also United States v. Hartstein, 500 F.3d 790, 796 (8th Cir. 2007) ("The government need not present

-6-

evidence as to each alleged victim, as [defendant] challenges neither the characterization of many of her lenders as victims nor the loan amounts claimed by the government as to many of these victims").

Additionally, the district court concluded that the government proved by a preponderance of the evidence that the number of victims was "something over 300 and perhaps more than 1,000," D. Ct. Order of Sep. 27, 2010, at 91, based on the systematic nature of Miell's fraud, during which Miell regularly inflated costs of repairs in damage deposit deductions. The district court credited as "a reasonable estimate" the report and testimony of forensic accountant Kerry Bolt, who calculated that Miell returned some portion of a deposit only 26% of the time and that Miell failed to return any portion of a deposit to 2,030 tenants during the offense conduct period. D. Ct. Order of Sep. 27, 2010, at 63. Spoliation of evidence and otherwise poor record-keeping prevented a complete analysis of tenant files and precise determination of the number of victims.[5] In describing the intended scope of Miell's fraud, the district court noted that it was "persuaded that the prosecution is correct that Miell intended to hold as much of each damage deposit as he possibly could, evident from the commingling of deposits with general income of Miell's business and the systematic attempts that Miell made to inflate claims against damage deposits . . . ." Id. at 64. Although additional evidence might have allowed for a more precise count, the district court did not commit clear error in concluding that the government had proved by a preponderance of the evidence that 250 or more people were defrauded by Miell's damage deposit scheme.

---

[5]The government argues that spoliation of evidence calls for an adverse inference against Miell concerning the number of victims. Although such a rule has been applied in civil cases, see Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 811 (8th Cir. 2005), it has not been applied in an Eighth Circuit criminal case. In light of the sufficiency of the available evidence that Miell victimized 250 or more people, we need not take a position on this contention.

## C.

Miell appeals the district court's application of a sixteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) for the loss caused by the damage deposit scheme exceeding $1 million. Loss under the Guidelines "is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). Because of the impracticability of reviewing more than 2,000 tenant files, particularly considering the destruction of pertinent records, the district court determined intended loss.

"The government must prove the intended loss by a preponderance of the evidence." United States v. Holthaus, 486 F.3d 451, 454 (8th Cir. 2007) (quoting United States v. Staples, 410 F.3d 484, 490 (8th Cir. 2005)). "The district court's method for calculating the amount of loss must be reasonable, but the loss need not be determined with precision." United States v. Hodge, 588 F.3d 970, 973 (8th Cir. 2009) (quoting United States v. McIntosh, 492 F.3d 956, 960-61 (8th Cir. 2007)). "[W]e accord particular deference to the loss determination because of the district court's unique ability to assess the evidence and estimate the loss." United States v. Scott, 448 F.3d 1040, 1044 (8th Cir. 2006) (internal citations omitted).

In determining intended loss, courts examine a defendant's subjective intent. Hartstein, 500 F.3d at 798 (concluding that the "defendant's actual, subjective intent . . . should drive our analysis"). The government characterizes Miell's subjective intent broadly and contends that he intended to keep every damage deposit all of the time. Evidence supporting this view includes Miell's diversion of damage deposits into his general revenue account rather than segregating the deposits into a separate bank or trust account as required by Iowa law, and his scheme to fraudulently alter tenants' move-out forms as a matter of course to inflate the alleged damages caused by the tenants.

The district court based its calculation of loss exceeding $1 million on the government's evidence of the approximate number of Miell's rental units multiplied by the average damage deposit amount per unit, which resulted in a total of $1,448,530.88. See U.S.S.G. § 2B1.1, cmt. n.3(C) (noting that the loss estimate may be based on "[t]he approximate number of victims multiplied by the average loss to each victim"). The government then subtracted $235,075.73 from this total based on evidence that Miell returned some portion of damage deposits 26% of the time and that the average amount returned on those occasions was $329.51, resulting in a total intended loss of $1,212,891.56.[6] The district court's loss calculation properly included these sums because they flowed from the government's evidence that Miell's claims against damage deposits were "systematically tainted with fraud," leading the district court to conclude that it was "difficult, if not impossible, to give him any credit for parts of his claims that might have been legitimate, if he had tried to assert those claims by legitimate means." D. Ct. Order of Sep. 27, 2010, at 64. Because the district court made a reasonable estimate of loss, one that is plausible in light of the record as a whole, its loss determination was not clearly erroneous.

III.

The sentence is affirmed.

_____

[6]The district court noted that the government's estimate was "conservative, particularly in light of the higher estimates resulting from more complete files" subsequently obtained. D. Ct. Order of Sep. 27, 2010, at 64. The government also submitted an alternative calculation methodology that included the additional sums above the damage deposits that Miell intended to seek from tenants. This approach resulted in an intended loss calculation of $3,676,470.