# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2779
_____

United States of America

*Plaintiff - Appellee*

v.

Sharif Karie

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Western Division

_____

Submitted: September 24, 2020
Filed: September 30, 2020

_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.

_____

BENTON, Circuit Judge.

Sharif Karie was convicted of conspiracy to commit theft of public funds, theft of public funds, aggravated identity theft, money laundering, and mail fraud under 18 U.S.C. §§ 371, 641, 642, 1028A, 1956(a)(1)(B)(i), and 1341. The district court[1] sentenced him to 58 months in prison and ordered him to pay $576,937.75 in total restitution, including $536,833.75 to the state of Missouri. He appeals his sentence

---

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri.

and the amount of restitution. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

The Child Care and Development Fund (CCDF)—a federal program—provides money to states in order to ensure access to high-quality childcare for low-income families. Under the CCDF, parents are not allowed to care for their own children because it would negate the Fund's purpose to enable parents to work or go to school.

In Missouri, under the CCDF, a childcare provider must maintain daily attendance records for each child in its care. The attendance sheet must record drop-off and pick-up times. To verify the attendance sheet, a parent must sign daily and again at the end of the month. Childcare providers then submit the attendance online. Based on the childcare provided and authorized, providers receive an electronic payment from the state. If childcare providers fail to keep adequate attendance records, the state has a right to recover funds provided.

In December 2011, Karie formed Karie Day Care Center LLC (KDCC). KDCC received its license, valid for two years, on October 7, 2013. In December 2013, KDCC hired Sheri Beamon as the director of the daycare. Karie taught Beamon how to use the online billing system.

Karie told employees that a prerequisite for employment was enrollment of their children in the daycare. Beamon enrolled five of her children. She testified that Karie's goal was to hire employees with as many children as possible. Karie maintained attendance sheets for his employees' children. He told employees the purpose of these sheets was to record their work hours, not their children's attendance. Even if employees left work early (which they often did), Karie requested they record their entire shifts on the attendance sheets. Karie also deducted money from his employees' paychecks if they did not qualify for the full reimbursement under the CCDF.

In September 2014, Brenda Lentz, a state employee, audited KDCC. The audit was prompted by a parent who said she was fired from KDCC because her children were no longer eligible for the CCDF. Lentz's audit revealed many issues. She found that 14 of the 15 families with children enrolled at the daycare had a parent working there, many caring for their own children. Lentz found many discrepancies with KDCC's attendance records, including that they were filled out monthly rather than daily. She also found improper billing practices.

In October 2014, federal agent Peter Blackburn arranged for a pole camera to monitor how many people were entering and leaving KDCC. In August 2015, the state placed KDCC on probationary status, due to numerous health, safety, and record-keeping violations not directly related to Agent Blackburn's surveillance.

KDCC's license expired on September 30, 2015. Karie did not renew it. Instead, on October 7, 2015, he formed a new daycare, Tima Child Care Center LLC (TIMA), listing his wife Mulki Hassan as the owner. Karie and Hassan met with a state agent to apply for another daycare license. Karie did most of the talking during the meeting. TIMA received its license on February 29, 2016, opening at the same location as KDCC. Again, Beamon was the director. Karie resumed his activities under TIMA, falsifying attendance sheets and billing incorrect information to the state. Learning of the reopening, Agent Blackburn continued his video surveillance.

In August 2018, Karie and Beamon were indicted. At trial, the government presented testimony from Agent Blackburn, Lentz, Beamon, Karie's ex-wife, five former employees of KDCC and TIMA, and five witnesses employed by various state and federal agencies. Karie presented one witness, a certified public accountant. His primary theory of defense was that Beamon alone was responsible and was lying about his involvement to get a lighter sentence.

On the amount of loss, the jury heard evidence that the CCDF paid $536,833.75 to KDCC and TIMA. Agent Blackburn testified that based on his observations, he estimated 69 percent of the services performed by KDCC and 46 percent of the services performed by TIMA were legitimate. Multiplying these percentages by the total amounts billed, Agent Blackburn estimated a total "loss

amount" of $165,208.27—$146,029.97 for KDCC and $35,515.43 for TIMA. The jury convicted Karie.

At sentencing, based on Agent Blackburn's testimony, Karie argued that up to 69 percent of billing was "valid and properly collectable," so the loss amount should total $165,208.27 instead of $536,833.75. Based on this calculation, Karie asked for a 10-level enhancement, not the 12-level enhancement for the total loss. The government replied that Blackburn was giving "the best case scenario." The Presentence Investigation Report (PSR) recommended a loss amount of $536,833.75 and a 12-level enhancement.

The district court agreed with the government and the PSR, finding that "based on a preponderance of the evidence," the totality of the circumstances, and the evidence at trial, the PSR reflected the correct loss amount. The district court calculated the total loss amount from to the billing practices of the two daycares to be $536,833.75. It applied a 12-level enhancement, sentenced Karie to 58 months in prison (within guidelines), and ordered restitution of $536,833.75 to the Missouri Department of Health and Human Services.

Karie appeals the offense level for his sentence and the amount of restitution.

II.

When examining a loss amount, this court reviews the district court's legal conclusions "de novo and its factual findings for clear error." ***United States v. Luna***, 968 F.3d 922, 928 (8th Cir. 2020). "[A]s long as the determination is plausible in light of the record as a whole, clear error does not exist." ***United States v. Harmon***, 944 F.3d 734, 738 (8th Cir. 2019). Though the government must prove sentencing enhancements by a preponderance of the evidence, the district court does not have to make a precise determination of the loss, only a reasonable estimate. ***Id.***

Under the Sentencing Guidelines, the offense level for fraud "depends on the greater of the 'actual' or 'intended losses,' the latter of which includes any 'pecuniary harm that the defendant purposely sought to inflict' even if it 'would have been impossible or unlikely to occur.'" ***United States v. Smith***, 929 F.3d 545, 547

(8th Cir. 2019) (cleaned up), *quoting* **U.S.S.G. § 2B1.1 cmt. n.3(A)**. Here, the district court calculated the actual loss, "the difference between what the victim paid and what the victim recovered plus any other forms of reasonably foreseeable pecuniary harm that resulted from the offense." *United States v. Belfrey*, 928 F.3d 746, 750 (8th Cir. 2019) (internal quotation marks omitted).

When calculating the offense level under U.S.S.G. § 2B1.1, the district court must "make an allowance for the legitimate, compensable services provided" by the defendant because the Sentencing Guidelines "provide an offset for the 'fair market value of . . . the services rendered . . . to the victim.'" *Luna*, 968 F.3d at 929, *quoting* **U.S.S.G. § 2B1.1, cmt. n.3(E)(i)**. For losses involving government benefits, there is a special rule: "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." **U.S.S.G. § 2B1.1, cmt. n.3(F)(ii)**.

By the Guidelines, if the loss amount is more than $150,000, but less than $250,000, the offense level increases by 10. **U.S.S.G. § 2B1.1(b)(1)(F)**. If the loss amount is more than $250,000, but less than $550,000, the offense level increases by 12. **U.S.S.G. § 2B1.1(b)(1)(G)**.

Karie's argument relies almost entirely on Agent Blackburn's estimates that 69 percent of KDCC's and 46 percent of TIMA's daycare services were legitimate. Karie fails to note, however, that Agent Blackburn made clear these were only the most "conservative" estimates and in making them, he gave Karie the "benefit of the doubt." For example, even if a child stayed at the daycare for only a few minutes, Agent Blackburn counted the child as present for the entire time billed. Other than Agent Blackburn's testimony, Karie provided no evidence that he provided legitimate daycare services. To the contrary, the state auditor testified that 14 of the 15 families with children at KDCC had a parent working there.

Karie relies on *United States v. Boesen*, 541 F.3d 838 (8th Cir. 2008), but that case is different. There, the defendant physician billed private insurers for "procedures and tests that were not actually performed or that were medically unnecessary." *Id.* at 843. However, the defendant also performed actual services and submitted legitimate bills. *Id.* at 850. The government argued that 67 percent of the

defendant's claims to private insurers were fraudulent. *Id.* But the district court concluded that only a 50 percent extrapolation was reasonable "under all of the circumstances of this case." *Id.* This court affirmed. *Id.* at 851.

Here, Karie presented no evidence that he provided legitimate services or submitted legitimate bills. And he certainly provided no evidence differentiating legitimate from illegal billing. The district court's calculation of the loss as the total amount paid to Karie's daycares was not clear error. *See United States v. Miell*, 661 F.3d 995, 1000-01 (8th Cir. 2011) (affirming a district court's calculation of loss based on the total money received for services because the defendant landlord's dealings were "systematically tainted with fraud" and it was impossible to tell which services were legitimate versus illegitimate); *Boesen*, 541 F.3d at 851 (this court accords "particular deference to the loss determination because of the district court's unique ability to assess the evidence and estimate the loss").

Even if the district court clearly erred in calculating the loss at $536,833.75, any error would be harmless. A 12-level enhancement applies if the loss amount is anywhere between $250,000 and $550,000. Agent Blackburn testified that based on his surveillance, the most conservative estimate of loss was $165,208.27. This testimony, combined with the wealth of other evidence that Karie failed to provide any legitimate daycare services, supports the finding that the loss amount was over $250,000. *See Belfrey*, 928 F.3d at 751 (an incorrect "application of the Guidelines is harmless error where the district court specifies the resolution of a particular issue did not affect the ultimate determination of a sentence").

The record supports the district court's conclusion that Karie was responsible for a loss amount between $250,000 and $550,000, and thus the offense level (and resulting guidelines range) was correct.

III.

Karie challenges the order of restitution, asserting that the district court erred by determining the loss amount as the total amount of reimbursements issued to KDCC and TIMA by the state of Missouri, $536,833.75.

This court reviews the district court's decision to award restitution for an abuse of discretion, and its finding of the loss amount for clear error. *United States v. Gammell*, 932 F.3d 1175, 1180 (8th Cir. 2019). The government "bears the burden of proving the amount of restitution based on a preponderance of the evidence." *Id.*; **18 U.S.C. § 3664(e)**.

The Mandatory Victims Restitution Act (MVRA) requires that a district court "shall order" restitution in cases where there is "an identifiable victim or victims has suffered a physical injury or pecuniary loss." **18 U.S.C. § 3663A(a)(1), (c)(1)(B)**. For purposes of the MVRA, a victim of an offense is "a person directly and proximately harmed by the offense." *Gammell*, 932 F.3d at 1180, *quoting* **18 U.S.C. § 3663A(a)(2)**. Once the district court has identified a victim, it must determine "the full amount of each victim's losses," based on the amount of *actual* loss caused by the defendant's offense. *United States v. Frazier*, 651 F.3d 899, 903 (8th Cir. 2011), *quoting* **18 U.S.C. § 3664(f)(1)(A)**. The district court has discretion to determine this amount "depending on the circumstances of each case." *Id.* at 904. Anything a victim "would have had to pay, regardless of the defendants' actions, cannot be a loss caused by the fraud." *Luna*, 968 F.3d at 930. Although the loss amount for sentencing and restitution purposes are calculated in the same manner, "the two determinations serve different purposes and thus may differ depending on the relevant facts." *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010).

The parties do not dispute the district court's decision to award restitution to the state of Missouri as the victim. Karie challenges only the amount of restitution. As with the first issue, Karie relies almost entirely on Agent Blackburn's estimate of the loss, $165,208.27—not the total amount paid to Karie's daycares by the state of Missouri, $536,833.75. However, as discussed, the district court, Agent Blackburn, the government, and the PSR indicated that these were just estimates, based on assumptions that gave Karie the "benefit of the doubt."

Where a defendant's dealings are "systematically tainted with fraud," a district court may determine that the total amount of payments equals the loss amount. *Miell*, 661 F.3d at 1001. "[A]lthough the ultimate burden of proving loss always remains with the government, the MVRA authorizes the district court to place on the defendant a burden of producing evidence of any legitimate services."

-7-

*United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019), *citing* **18 U.S.C. § 3664(e)**. If the defendant does not produce this evidence, the prosecution "may rely on the existence of a pervasive fraud to argue that all services were infected by fraud in some way, and therefore that payments for all services represent loss under the MVRA." ***Id.***; *see **United States v. Archer***, 671 F.3d 149, 173 (2d Cir. 2011) (noting that "where the prosecution's burden of proof would require it to prove a negative and the facts at issue are more readily ascertainable by the defendant, the defendant is often obliged to assume [the] burden of production of evidence").

Here, based on a preponderance of the evidence, the district court agreed with the PSR that Karie's "entire day care business was permeated by fraud and established to commit fraud" and "[t]here is no way to discern if any legitimate services were provided." At trial, Karie presented only one witness, a certified public accountant, who did not address the legitimacy of Karie's daycares or any of the services it provided. The government presented many witnesses who testified to the insufficiency of the attendance records and the fact that in order to be employed at the daycares, employees had to have children enrolled there. The state auditor testified that 14 of the 15 families with children at the daycare had a parent working there; one employee had 10 children enrolled.

In *Luna*, this court recognized an offset to the amount of restitution. ***Luna***, 968 F.3d at 930. There, in a recruitment-and-kickback scheme, the defendant doctors paid recruiters to seek victims of car accidents. ***Id.*** at 925. The doctors then fraudulently treated patients to collect insurance reimbursements. ***Id***. Although the district court made a reasonable estimate of the actual loss suffered by the victim, it failed to "make an allowance for the legitimate, compensable services provided by the [defendant]." ***Id.*** at 929 (noting that the district court's findings did not rule out the possibility that insurance providers had no obligation to pay or that the services were unnecessary, unreasonable, or never provided).

Here, however, Karie presented no evidence that he provided "legitimate, compensable services." ***Id***. Even if some services were arguably legitimate, Karie has no legal right to the money because he failed to keep adequate and complete records certifying attendance for each child. *See **id.*** at 930 (discussing restitution where the insurer had "no obligation to pay"). According to the Provider Contract

Agreement (PCA), the state of Missouri has the "right to recover all funds for which adequate verification and full documentation" are not maintained, including "inadequate or lack of attendance records." Missouri also has "the authority to impose monetary or other sanctions in cases of . . . fraudulent, repealed contract or payment violations." Especially relevant for TIMA, the PCA requires applicants certify that they are not presently suspended, debarred, ineligible, or excluded—*voluntarily or otherwise*—from participation in federal programs, like the CCDP. If falsely certified, the penalty is loss of payment.

The district court (and the jury) credited the testimony of state and federal agents who detailed the lack of recordkeeping or improper recordkeeping at Karie's daycares. The state auditor testified that the attendance records had numerous problems and inconsistencies. Agent Blackburn testified that an authorized search of KDCC's computers showed a lack of records, records that did not match KDCC's billings to Missouri, and records completed all in one sitting, contrary to the PCA. Karie never disputed that his daycares' records were inadequate, inaccurate, or incomplete. In this case, treating the entire amount obtained by Karie as the loss amount ensures that he does not "benefit from the comprehensive alteration of [his] own records." ***Bikundi***, 926 F.3d at 792.

The district court did not clearly err in concluding that the $536,833.75 paid to Karie's daycares by Missouri is the loss amount under the MVRA. *See **Harmon***, 944 F.3d at 738-39 (holding restitution award was based on a "reasonable estimate of loss" and not clearly erroneous).

\* \* \* \* \* \* \*

The judgment is affirmed.

_____