# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3563

_____

United States of America

*Plaintiff - Appellee*

v.

Coleman Carpenter

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 23, 2016
Filed: November 23, 2016

_____

Before WOLLMAN, BRIGHT, and KELLY, Circuit Judges.

_____

BRIGHT, Circuit Judge.

The government charged Coleman Carpenter with mail and wire fraud arising from a scheme in which he overpaid for commodities to the benefit of certain customers while managing a grain elevator for Bunge of North America (Bunge). After Carpenter pleaded guilty to one count of mail fraud, the district court sentenced him to twelve months and one day in prison. The district court also ordered him to

pay $1,561,516.25 in restitution to Bunge, which included $87,536.65 in attorney's fees and expenses Bunge paid to an outside counsel during the investigation of Carpenter's fraudulent scheme and his prosecution.

Carpenter appeals arguing the district court erred in calculating the amount of restitution, and by including the attorney's fees from Bunge's outside counsel in the restitution award. We affirm the portion of the district court's restitution award which does not include attorney's fees ($1,473,980.00), but vacate the portion awarding attorney's fees and expenses ($87,536.65), and remand to the district court for further proceedings.

I

Bunge, a global agriculture commodities business, employed Carpenter as the manager of a grain elevator in Hickman, Kentucky. Bunge authorized Carpenter to purchase agricultural commodities, which included corn, wheat and soybeans, from producers and merchants "on the spot." In addition, Carpenter could enter into futures contracts for commodities to be delivered at a later date.

Futures contracts had two components: the futures price and the basis. The first component – the futures price – was set by commodities markets. Bunge provided Carpenter access to the current futures prices electronically and through a commercial trading desk (hedge desk) located at its St. Louis, Missouri headquarters. Carpenter was authorized to establish the futures price component of the per bushel price for a particular futures contract based upon the current futures price as determined by the Chicago Board of Trade (CBOT).

The second component – the basis – was set by Bunge and depended on various market conditions, such as location of a point of purchase, operational needs

of Bunge, and prices offered by a competitor.[1]  Bunge gave Carpenter the authority to "push the basis" in order to respond to changing market conditions or the operational needs of Bunge, but limited this authority to $.08 per bushel at the most. So, for example, if the basis at a given time was $-.15, Carpenter had the authority to push it to $-.07.

Between 2009 and 2013, Carpenter frequently entered into futures contracts in excess of the combination of the CBOT current futures price and Bunge's basis, and his limited authority to "push the basis."  In fact, on some occasions Carpenter increased the price Bunge paid for commodities by $.30, $.40, or .$50 per bushel.  For example, on August 1, 2013, Carpenter entered into a futures contract for 60,000 bushels of corn at $5.25 per bushel.  Carpenter utilized a futures price of $5.63 per bushel with a basis of $-.38, despite the fact that the hedge desk provided him with a CBOT current futures price of only $4.9075, and the highest price paid on the CBOT that day for corn was $4.9975.

Thus, Carpenter inflated the futures price component of the contract by $.7225 per bushel based on the CBOT current futures prices, or by $.6325 per bushel based on the CBOT high price of the day.  After adjusting for the basis, the amount Bunge lost on this single contract was $43,350, as measured by the difference between the $5.63 futures price utilized by Carpenter and the approved CBOT current futures price of $4.9075 (60,000 bushels x $.7225).  Carpenter then misrepresented these unauthorized transactions in mailings to Bunge headquarters.

During the scheme, Carpenter received large payments of money from some of the grain elevator customers.  For example, in consecutive years in March 2009

---

[1]Examples in the record report the basis as a negative number, such as $-.38. In other words, the final price of any particular futures contract for the selling farmer – after combining the CBOT current futures price and Bunge's basis – would likely be below the CBOT current futures price to reflect Bunge's operating costs.

and 2010, Carpenter received $10,000 checks from Ronnie Bates Farms, one of the grain elevator's customers. Carpenter's bank account also showed large cash deposits made between 2009 and 2013 totaling over $38,000. Carpenter denies the cash deposits he made to his bank account during that time were related to the fraud scheme.

In 2013, Bunge discovered Carpenter's fraud during an internal audit. Bunge asked the Thompson Coburn law firm in St. Louis to assist in reviewing and assessing Carpenter's unauthorized transactions, while at the same time providing information to the government for potential criminal charges against Carpenter. Thompson Coburn assisted Bunge and the government in reviewing the transactions both before and after a federal grand jury returned an indictment against Carpenter on June 25, 2014. After being charged, Carpenter pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341.

Prior to sentencing, a probation officer prepared a Presentence Investigation Report (PSR) which, in part, calculated the amount of loss that resulted from Carpenter's fraud pursuant to United States Sentencing Guidelines Manual (U.S.S.G.) § 2B1.1. The PSR determined loss using a "one-day Chicago Board of Trade high price" as the number to be subtracted from the inflated price paid by Carpenter. For its part, the government recommended loss should be calculated by comparing a "two-day" CBOT high price to the price of Carpenter's unauthorized transactions, which was more conservative than the method recommended by the PSR and resulted in a lower loss amount. Using this two-day method of calculation, the government determined Bunge overpaid its customers approximately $937,000 as the result of Carpenter's unauthorized transactions. In Carpenter's plea agreement, he admitted his fraud scheme resulted in "approximately $937,000" in overpayments by Bunge to various customers.

At sentencing, the district court adopted the parties' agreement as to amount of loss to calculate Carpenter's advisory guidelines range, and then turned to the separate

issue of determining the amount of loss for purposes of restitution. The district court agreed the precise amount of restitution was difficult to calculate because the market price at the exact time of day Carpenter entered into each of his fraudulent transactions was unknown. The district court ultimately adopted the PSR's one-day method to determine restitution, however, because Bunge's losses would be underestimated using either the one- or two-day method based on the CBOT high price of the day. Under the one-day method of calculation, the district court set the amount of Bunge's loss for restitution purposes at $1,473,980.00.

Bunge also sought restitution for the attorney's fees it paid to outside counsel prior to and during the government's investigation. Carpenter objected to the attorney's fees arguing, in part, that fees incurred after the government started its investigation were not "necessary." See 18 U.S.C. § 3663A(b)(4) ("The order of restitution shall require that such defendant—in any case, reimburse the victim for . . . necessary . . . expenses incurred during participation in the investigation or prosecution of the offense."). The district court reviewed the billing statements provided by Bunge's counsel and then awarded 90% of the claimed fees, reflecting a 10% reduction for specific fees associated with a press release, reproduction charges, punitive damages issues, correspondence, and courier services, to which Carpenter had also objected. After the reduction, the fees and associated expenses totaled $87,536.65. Including the attorney's fees, the total restitution the district court awarded to Bunge was $1,561,516.25. Bunge filed this timely appeal challenging the amount of restitution.

II

We review the district court's decision to award restitution for abuse of discretion, but any fact findings as to the amount are reviewed for clear error. United States v. Chalupnik, 514 F.3d 748, 752 (8th Cir. 2008). "The government bears the burden of proving the amount of restitution based on a preponderance of the evidence." United States v. Frazier, 651 F.3d 899, 903 (8th Cir. 2011).

-5-

A.    The Overpayments

Carpenter contends the district court erred in awarding the initial $1,473,980.00 in restitution (the amount less the attorney's fees) for two reasons. First, Carpenter contends the amount of restitution is difficult, if not impossible, to determine and is not warranted. See 18 U.S.C. § 3663A(c)(3)(B) ("This section shall not apply . . . if the court finds . . . that determining complex issues of fact related to the . . . amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process"). Second, Carpenter argues that Bunge did not sustain a loss because Bunge factored in his overpayments when it ultimately sold the commodities he purchased.

With respect to Carpenter's first argument, we have consistently held that "the district court has wide discretion in ordering restitution." United States v. DeRosier, 501 F.3d 888, 897 (8th Cir. 2007). When determining restitution, "the district court need make only a reasonable estimate of the loss, and we accord particular deference to the loss determination because of the district court's unique ability to assess the evidence and estimate the loss." Id. at 895 (quoting United States v. Scott, 448 F.3d 1040, 1044 (8th Cir. 2006)). In cases where the amount of loss (and by extension the amount of restitution) caused by fraud is difficult to calculate, "a district court is charged only with making a reasonable estimate of the loss." United States v. Parish, 565 F.3d 528, 534 (8th Cir. 2009) (internal quotation marks and citation omitted).

Carpenter's claim that the loss was impossible to calculate is belied by his own admission in the plea agreement that his fraud scheme resulted in "approximately $937,000" in overpayments by Bunge to various customers using the government's more conservative two-day CBOT high price method of calculating the loss. Thus, the real issue presented in this appeal is limited to whether the district court erred by choosing the one-day method over the two-day method when calculating loss and restitution. The two-day method assumed that some of Carpenter's fraudulent

-6-

transactions were actually agreed to at the high price of one day, but due to administrative delays at the Hickman facility, may not have been completed until the next day. Using this method, the highest price over any given two-day period was used to compute loss. In contrast, the one-day method used the CBOT high price of the day a commodity purchase was made. Carpenter objects to the district court's use of the one-day method because it resulted in a higher loss than that calculated under the two-day method.

We see no grounds for reversing the district court's decision to choose the one-day method over the two-day method. As we previously stated, exact precision is not necessary when determining loss, only a reasonable estimate. Either method the district court would have chosen here would have been reasonable, as both methods underestimated Bunge's actual loss. The times when Carpenter made unauthorized transactions occurred throughout each day, not necessarily every time the CBOT price was at its highest. For example, in the August 2013 purchase of corn discussed above, the CBOT current futures price provided to Carpenter at the time of sale was $4.9075, while the highest price paid on the CBOT that day for corn was $4.9975, a difference of $.09 per bushel, or a total of $5400 for the 60,000 bushel sale. The one-day method used by the district court did not capture the additional $5400 Bunge lost on this particular sale (as reflected in the PSR at ¶ 20, which only reported a loss of $37,950 on this particular transaction rather than the $43,350 Bunge actually lost), or the similar amounts Bunge lost on Carpenter's many other fraudulent transactions. Because the exact times of the unauthorized trades could not be determined, the use of the CBOT daily high price automatically ensured that Bunge's actual loss would be underestimated under both methods of calculation.

Carpenter next argues that Bunge did not sustain a loss (and by extension was not entitled to restitution) because Bunge recouped his overpayments at the time of its sale. The district court used the correct standard of lost profits to determine Bunge's loss. See United States v. Chalupnik, 514 F.3d 748, 755 (8th Cir. 2008).

Here, Bunge's lost profits were based on the difference between the authorized purchase price and the amount of Carpenter's unauthorized purchases. The lost profits remained constant regardless of the resale price. Finally, Bunge does not have exclusive control over the sale price as Carpenter seems to contend. The commodities market is a global market that dictates the sale price. The district court properly determined that the loss sustained by Bunge was the total amount of lost profits and that the lost profits remain constant regardless of the sale price.

B.    The Attorney's Fees

Carpenter contends that attorney's fees incurred by Bunge's outside counsel after the government took over the investigation were not "necessary" under 18 U.S.C. § 3663A(b)(4). Carpenter relies primarily upon United States v. Papagno, 639 F.3d 1093 (D.C. Cir. 2011), which reversed a restitution order awarding expenses incurred by a victim during its own internal investigation of an employee's fraud where there was no evidence the investigation was ever requested by criminal investigators or prosecutors, holding that under those circumstances the victim's "'*participation* in the investigation or prosecution of the offense'" was not "'necessary.'" Id. at 1095 (quoting 18 U.S.C. § 3663A(b)(4)).

Our circuit has taken a somewhat broader view of the loss that can be included in a restitution award, and have "specifically approved of the inclusion of attorney's fees and investigative costs in a restitution award when these losses were caused by the fraudulent conduct." DeRosier, 501 F.3d at 897 (citing United States v. Akbani, 151 F.3d 774, 780 (8th Cir. 1998); United States v. Piggie, 303 F.3d 923, 928 (8th Cir. 2002)). As Carpenter contends, however, the fact that there is no per se prohibition on awarding restitution for attorney's fees or investigative costs does not relieve the government from satisfying the statutory requirement of showing such costs were "necessary . . . expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4).

Carpenter's specific objection in the district court was that outside attorney's fees incurred by Bunge after the government initiated its own investigation were unnecessary. The record does not show the district court ever directly addressed that claim, or made a specific finding that the fees were necessary. Instead, the district court only appears to have addressed Carpenter's other objections to the attorney's fees submitted by outside counsel. We therefore vacate the district court's award of attorney's fees and expenses and remand to the district court to specifically address whether the attorney's fees incurred after the government initiated its own investigation were "necessary" under § 3663A(b)(4). If the district court determines that any portion of the fees were not "necessary," those fees should not be included in the restitution award.[2]

## III

We affirm that portion of the district court's restitution order awarding $1,473,980.00. We vacate the portion of the district court's restitution order awarding attorney's fees and remand for further proceedings consistent with this opinion.

—————————————————

[2]If read liberally, Carpenter's objection to the attorney's fees in the district court also raised a claim that he should be entitled to a "set off" from the total amount of restitution awarded if Bunge's insurance company pays for any claim related to Carpenter's fraudulent conduct. To the extent Carpenter renews that claim on appeal, we reject it. When an insurer makes payments for a victim's loss, a defendant is required to pay restitution back to the insurance provider under the Mandatory Victims Restitution Act, and is not entitled to a set off. United States v. Mancini, 624 F.3d 879, 882 (8th Cir. 2010).