# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-2211

_____

United States of America

*Plaintiff - Appellee*

v.

John Kelsey Gammell

*Defendant - Appellant*

_____

No. 18-2692

_____

United States of America

*Plaintiff - Appellee*

v.

John Kelsey Gammell

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: March 15, 2019
Filed: August 8, 2019

_____

Before SHEPHERD, ERICKSON, and KOBES, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

After conducting a series of malicious computer attacks, John Gammell pled guilty to one count of conspiracy to cause intentional damage to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A), (b), (c)(4)(A)(i)(I), (c)(4)(A)(i)(VI), and (c)(4)(B), and to two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(e). The district court[1] sentenced Gammell to 60 months on the conspiracy count and, after classifying Gammell as an armed career criminal, to 180 months on the felon-in-possession counts, with the sentences running concurrently. The district court also ordered Gammell to pay $955,656.77 in restitution to 14 victims of his attacks. In this consolidated appeal, Gammell challenges both his classification as an armed career criminal and the district court's restitution order. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Between 2015 and 2017, Gammell engaged in a campaign of malicious computer attacks against various entities with whom he had personal grievances. The attacks, known as distributed denial of service attacks, or DDoS attacks, use repeated

_____

[1]The Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota.

attempts to deny service to a computer or website, thereby making it inaccessible to users or customers. In essence, DDoS attacks flood a computer or website with massive amounts of internet traffic to the point that the computer or website becomes disabled and inaccessible to users or customers.

Gammell victimized approximately 40 different entities, comprised of companies he used to work for, companies that did not hire him, companies that he perceived as competitors to his business, law enforcement agencies, and court systems. His attacks lasted anywhere from weeks to two years and resulted in the disruption or complete disabling of the victims' websites, applications, or computer systems. Each of his victims experienced difficulty in restoring the reliability, functionality, and accessability of the affected websites, and expended significant efforts and resources in identifying the source of the attacks and in taking suitable mitigation and infrastructure improvement measures.

Throughout the course of his attacks, Gammell made considerable efforts to conceal his identity as the perpetrator. When using his own computer to launch DDoS attacks, Gammell used a service to mask his IP address, used encrypted and drive cleaning tools to conceal any evidence of the attacks on his computer, spoofed email addresses, and used names of victims' former employees to create suspicion against other individuals. Gammell also utilized third-party companies to launch attacks, which significantly multiplied the number of attacks and further concealed Gammell as the perpetrator. Gammell also used cryptocurrency to pay the third-party companies in a continued effort to conceal his identity. On at least two occasions, Gammell also sent emails to affected entities, bragging about the attacks and mocking the entities for the disruptions.

Gammell was subsequently charged with conspiracy to cause intentional damage to a protected computer, along with two counts of being a felon in possession of a firearm. The two felon-in-possession counts arose out of conduct that occurred

outside of Minnesota. In May 2017 in Colorado, Gammell possessed the parts necessary to build an AR-15 assault rifle and he possessed 420 rounds of ammunition. Also in May 2017, in New Mexico, Gammell possessed two handguns and hundreds of rounds of ammunition. Gammell pled guilty to all three counts pursuant to a plea agreement, which included a waiver of venue with respect to the felon-in-possession counts.

At sentencing, the district court determined that Gammell had at least three prior convictions for violent felonies that qualified as predicate offenses under the Armed Career Criminal Act (ACCA). The district court identified the three predicate offenses as two convictions in Minnesota state court in 1981 for aggravated robbery, in violation of Minn. Stat. §§ 609.245 and 609.11 (1979), and a 1984 conviction in Minnesota state court for aiding and abetting second-degree burglary, in violation of Minn. Stat. §§ 609.582 subd. 2(a) and 609.05 (1983). The district court determined a United States Sentencing Guidelines range of 135 to 168 months imprisonment. However, due to the ACCA-triggered mandatory minimum of 180 months for each of the felon-in-possession counts, the district court set the appropriate sentencing range at 180 months. The district court imposed a 180-month sentence for each felon-in-possession count and a 60-month sentence for the conspiracy count. The district court ordered the sentences to run concurrently, for a total term of imprisonment of 180 months. The district court also ordered that Gammell pay restitution pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, but left the amount pending to allow for an evidentiary hearing. After the subsequent two-day evidentiary hearing, the district court ordered Gammell to pay restitution to 14 of his victims in the total amount of $955,656.77. This consolidated appeal follows.

II.

Gammell first asserts that the district court erroneously sentenced him as an armed career criminal, arguing that the district court incorrectly concluded that he had the requisite predicate offenses. "We review de novo whether a prior conviction is a predicate offense under the ACCA." United States v. Eason, 829 F.3d 633, 640 (8th Cir. 2016) (quoting United States v. Shockley, 816 F.3d 1058, 1062 (8th Cir. 2016)).

The district court sentenced Gammell to the statutory minimum of 180 months as an armed career criminal based upon three previous convictions for violent felonies under Minnesota law. See 18 U.S.C. § 924(e)(1) ("In the case of a person who violates section 922(g) of this title and has three previous convictions . . . for a violent felony or a serious drug offense, or both . . . such person shall be . . . imprisoned not less than fifteen years . . . ."). Gammell argues that his two prior convictions for aggravated robbery are not violent felonies and asserts that his previous conviction for aiding and abetting second-degree burglary cannot serve as a predicate offense because Minnesota's aiding and abetting statute is broader than generic aiding and abetting. We find both contentions unpersuasive.

First, as Gammell concedes, prior panels of this Court have already determined that aggravated robbery under Minnesota law is a violent felony. See United States v. Libby, 880 F.3d 1011, 1014, 1016 (8th Cir. 2018) (stating that aggravated robbery involves the "commission of simple robbery while armed with a dangerous weapon[,]" and concluding that "the elements of Minn. Stat. § 609.245, subd. 1 categorically present a violent felony under the ACCA" (internal quotation marks omitted)); see also United States v. Pettis, 888 F.3d 962, 966 (8th Cir. 2018), cert. denied, 139 S. Ct. 1258 (2019) ("Thus, state caselaw supports a finding that Minnesota simple robbery requires violent force and qualifies as a predicate offense under the ACCA."). As we are bound by prior panel decisions of our Court, we reject

-5-

Gammell's contention. See Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc). The district court appropriately considered Gammell's prior aggravated robbery convictions as violent felonies.

Second, Gammell's argument regarding his conviction for aiding and abetting second-degree burglary is premised upon his assertion that a distinction exists between accomplice liability and primary liability for the purposes of ACCA applicability. He does not dispute that second-degree burglary is a violent felony; rather, he asserts that aiding and abetting accomplice liability is distinct from the substantive offense and requires evaluation of the Minnesota aiding and abetting statute. But as our Court has previously explained "[a]iding and abetting, not itself an offense, [is] simply one way to prove [the defendant] guilty of [the substantive offense]." United States v. Zackery, 494 F.3d 644, 649 (8th Cir. 2007). Further, our Court has explicitly rejected this distinction for the purposes of applicability of the ACCA:

> For purposes of § 924(e)(2)(B)(i), it is irrelevant that Salean's 1995 conviction was for aiding and abetting fourth degree assault. See United States v. Groce, 999 F.2d 1189, 1191-92 (7th Cir.1993); accord United States v. Brown, 550 F.3d 724, 728 (8th Cir. 2008) (aiding the commission of aggravated robbery is a crime of violence under U.S.S.G. § 4B1.2). Because modern criminal statutes abrogate the common law distinction between principals and aiders and abettors, the "generic sense" of statutes prohibiting crimes such as assault "covers . . . 'aiders and abettors' as well as principals." Gonzales v. Duenas-Alvarez, 549 U.S. 183, 190, 127 S. Ct. 815, 166 L.Ed.2d 683 (2007).

United States v. Salean, 583 F.3d 1059, 1060 n.2 (8th Cir. 2009). Thus, for the purposes of applying the ACCA, it matters not whether Gammell was convicted as a principal or aider or abettor; it matters only whether the substantive offense qualifies as a violent felony. See Douglas v. United States, 759 Fed. App'x 554, 555 (8th Cir. 2019) (per curiam) (rejecting argument that defendant's prior conviction for

aiding and abetting first-degree aggravated robbery under Minnesota law did not qualify as a violent felony, noting that, for purposes of ACCA, it is irrelevant whether conviction is premised on aiding and abetting liability). As Gammell does not dispute that second-degree burglary is a violent felony, the district court did not err in counting this conviction as a predicate offense under the ACCA. We find no error in the district court's sentencing of Gammell as an armed career criminal.

## III.

Gammell next challenges the district court's restitution order, asserting that the district court impermissibly awarded compensation for costs of investigations that the victims voluntarily undertook, erroneously awarded Gammell's victims a windfall, and based the award on insufficient and unreliable evidence. Each of Gammell's arguments is unavailing. "We review the district court's decision to award restitution for an abuse of discretion and the district court's finding as to the amount of loss for clear error. The government bears the burden of proving the amount of restitution based on a preponderance of the evidence." United States v. Frazier, 651 F.3d 899, 903 (8th Cir. 2011) (citations omitted). "We review de novo any legal interpretations the court made when determining its obligation to award restitution." United States v. Adetiloye, 716 F.3d 1030, 1038-39 (8th Cir. 2013).

Under the MVRA, the district court "'shall order' a defendant convicted of 'an offense against property under this title, . . including any offense committed by fraud or deceit[,]' to pay restitution to a 'victim of the offense.'" Id. at 1039 (alterations in original) (quoting 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii)). A victim of the offense is "a person directly and proximately harmed by the offense." 18 U.S.C. § 3663A(a)(2). "Once the court has identified the victims, the next step is to determine 'the full amount of each victim's losses.'" Frazier, 651 F.3d at 903 (quoting 18 U.S.C. § 3664(f)(1)(A)). The appropriate measure of loss "must be based

-7-

on the amount of loss *actually* caused by the defendant's offense." Id. at 903-04 (quoting United States v. Petruk, 484 F.3d 1035, 1036 (8th Cir. 2007)). Although a restitution award must be tied to actual loss,

> [i]nstead of prescribing a single method to be applied in all circumstances, the law contemplates discretion by the sentencing court in determining how to value a victim's losses. Consequently, the 'value' of lost property under the MVRA must be determined in the district court's discretion depending on the circumstances of each case.

Id. at 904 (citation omitted). Utilizing this framework, the district court determined that Gammell's 14 victims suffered losses in the amount of $955,656.77 and ordered restitution in this amount.

Gammell first asserts the district court's restitution order must be reversed because it includes costs associated with investigations that victims independently undertook apart from the government's investigation into Gammell's attacks. See Lagos v. United States, 138 S. Ct. 1684-1690 (2013) (holding that under § 3663 costs of investigation that a victim voluntarily undertakes were not property included in a restitution award). Gammell asserts that this holding changes the landscape of every restitution award under the MVRA, but his reliance on Lagos is misplaced. Lagos considered the recoverability of costs of investigations with respect to restitution awards under 18 U.S.C. § 3663A(b)(4), which governs restitution as it relates to lost income and other expenses incurred during the investigation or prosecution of an offense. See id. at 1687. Here, as the district court noted, it ordered restitution pursuant to a separate subsection of the MVRA, § 3663A(b)(1), which governs restitution regarding damage, loss, or destruction of property. The district court did not make any award specifically tied to expenses incurred in investigating Gammell as the perpetrator or in prosecuting Gammell's crimes. Rather, the so-called investigative costs were "a prerequisite to repairing or replacing the damaged property[,]" and thus were tied to compensation for property damage. See Restitution

Order 12, Dist. Ct. Dkt. 131. Lagos thus has no applicability to a restitution award made pursuant to § 3663A(b)(1), a separate subsection unrelated to costs of investigation.

Second, Gammell asserts that the district court erred in ordering $955,656.77 in restitution because it improperly included expenses that victims incurred for mitigation services and infrastructure modifications, which effectively provided victims with a windfall because it allowed the victims to recover costs against future and speculative property loss due to already-existing security vulnerabilities. But as the district court noted, the unique and pervasive nature of Gammell's attacks required specific and extensive efforts to restore the affected website and applications to proper functionality. The district court discussed in detail the nature and substance of these efforts, including that "Gammell's victims were deprived of their property—namely, reliable access to and use of their websites and web applications—absent the mitigation efforts they used," before concluding that "[t]hese costs effectively equate to repair or cleanup costs because they involve mitigating the damage caused by Gammell's DDoS attacks and restoring a website or web application to its normal functionality, without necessarily replacing the website or web application." Restitution Order 8, 10. We find no error in the district court's determination that these expenses were compensable as repair or cleanup costs under the MVRA.

Finally, Gammell challenges the sufficiency and reliability of the evidence supporting the restitution award, asserting that requests for restitution were based on vague claims, that the victims failed to document their losses, and that the government failed to verify the amount requested by each victim. But Gammell's argument ignores the realities of the district court's thoughtful and thorough restitution order, entered following a two-day evidentiary hearing. The district court summarized the evidence upon which it based its order as follows:

Here, the United States introduced in evidence signed declarations or affidavits from each of the 14 victims that seeks restitution. These declarations and affidavits describe, in varying degrees of detail, the actions each victim took to mitigate or remediate the damage caused by Gammell's DDoS attacks and the costs associated with those actions. In addition to the fees and labor costs involved in obtaining DDoS mitigation services and moving websites to new web hosts, Gammell's victims paid employees and third-party vendors to take other responsive actions, including investigating and diagnosing the disruptions and mitigating and remediating the effects of the DDoS attacks. Accompanying these declarations and affidavits are hundreds of pages of underlying documentation that the United States obtained from the victims, including emails, invoices and letters from third-party vendors, timesheets, and other summaries and spreadsheets. Moreover [FBI] Agent Behm testified about the contents of these documents as well as details he learned from his personal conversations with the victims.

Restitution Order 12. The district court also noted that because Gammell's "attacks created crisis situations for his victims that required immediate action," victims did not track all responsive actions "with the level of precision that Gammell now demands" and stated that "[t]hat each victim did not respond in an identical manner to Gammell's attacks is not surprising and does not render the evidence unreliable." Restitution Order 13. These factors did not render the evidence so insufficient and unreliable as to undercut the validity of the district court's "reasonable estimate of the loss[.]" United States v. Carpenter, 841 F.3d 1057, 1060 (8th Cir. 2016) (internal quotation marks omitted).

The voluminous and detailed evidence provided a legally sufficient basis for the district court to determine the appropriate amount of restitution, and we give the district court's determination of this amount considerable deference. See id. ("[W]e accord particular deference to the loss determination because of the district court's unique ability to assess the evidence and estimate the loss." (internal quotation marks omitted)). The district court thus committed no error in its restitution order.

-10-

IV.

For the foregoing reasons, we affirm.

KOBES, Circuit Judge, concurring in part and concurring in the judgment.

I join the court's opinion except the portion of Section II that holds that aiding and abetting second-degree burglary in Minnesota is an ACCA predicate. I agree with the result, but I do not agree it is compelled by *United States v. Salean*, 583 F.3d 1059 (8th Cir. 2009). In my view, *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007) requires us to analyze whether there is "something special" about Minnesota aiding and abetting that makes it broader than generic aiding and abetting. Because I do not believe Minnesota strays from the generic definition, I join the judgment of the court.

In *Salean* we held that it was irrelevant, under the ACCA, that the defendant was convicted in Minnesota for aiding and abetting fourth-degree assault rather than for fourth-degree assault as a principal because modern criminal law has abrogated the distinction between principal and accomplice liability. *Id.* at 1060 n.2. We reached that conclusion in response to a very different argument than is presented here. Salean argued that his conviction should not have counted as a violent felony because, in contrast to committing assault as a principal, it was not necessary for him to use physical force in aiding and abetting assault. *See* Appellant Br. at 3, 10–11, *Salean*, 583 F.3d 1059 (No. 08-3315). Gammell, on the other hand, argues that Minnesota aiding and abetting liability is categorically broader than the generic aiding and abetting liability that Congress intended to include within all predicate offenses under the ACCA. "[W]e are generally not bound by a prior panel's implicit resolution of an issue that was neither raised by the parties nor discussed by the

-11-

panel." *Streu v. Dormire*, 557 F.3d 960, 964 (8th Cir. 2009). As a result, although *Salean*'s language sweeps broadly, it does not control our decision here.[2]

Both Supreme Court and Eighth Circuit precedent require us to evaluate Gammell's claim about the scope of Minnesota aiding and abetting. In *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 191 (2007), when confronted with a similar argument about the scope of California's definition of aiding and abetting, the Supreme Court said that a conviction potentially based on an aiding and abetting theory would not qualify as a predicate offense under the Immigration and Nationality Act if a defendant could show that there was "something *special* about [his state's] version of [aiding and abetting]—for example, that [his state] in applying it criminalizes conduct that most other states would not." We recently recognized the same possibility in the ACCA context when evaluating the aiding and abetting statute in Iowa. We reasoned that "[a]s aiding and abetting liability is inherent in every conviction under [the Iowa statute at issue], it is consistent with the categorical approach to look to Iowa's aiding and abetting statute in determining whether the prior offense of conviction is overbroad." *United States v. Boleyn*, --- F.3d ----, 2019 WL 2909307, at *3 n.3 (8th Cir. July 8, 2019). Gammell was convicted of aiding and abetting second-degree burglary and has made the same type of argument as the appellants in *Boleyn* and *Duenas-Alvarez*. We are therefore required to analyze Minnesota's aiding and abetting law.

Gammell claims that two features of Minnesota's aiding and abetting doctrine criminalize conduct that other jurisdictions do not. First, he argues that Minnesota ascribes accomplice liability to those who are merely present at the scene of a crime.

---

[2] The argument was presented in *Douglas v. United States*, 759 Fed. App'x 554 (8th Cir. 2019) (per curiam), but that opinion is unpublished and has no precedential value. *See* Eighth Circuit Rule 32.1A. *Douglas* is also not persuasive because it did not address the issue Gammell raises except to cite *Salean* for the same proposition as the majority in this case.

He points us chiefly to *State v. Ostrem*, 535 N.W.2d 916 (Minn. 1995) and *State v. Parker*, 164 N.W.2d 633 (Minn. 1969). Both cases contain language that arguably supports his position. *See Ostrem*, 535 N.W.2d at 925–26 ("There is convincing evidence indicating not only that Ostrem was at the farmhouse while the crime was being committed, but also that he did nothing to 'thwart its completion' and in fact, when confronted . . . Ostrem passively condoned [the principal's] efforts to cover up the crime."); *Parker*, 164 N.W.2d at 641–42 ("[T]he defendant's close association with the other men who appeared in the stolen car . . . and the fact that the three of them were apprehended fleeing from the convertible stolen from the victim, all tend reasonably to justify the conclusion that defendant joined with the other two . . . ."). However, I read both cases as in line with the federal definition of aiding and abetting.

Although federal aiding and abetting requires "some conduct of an affirmative nature and mere negative acquiescence is not sufficient," *Johnson v. United States*, 195 F.2d 673, 675–76 (8th Cir. 1952), "[i]n proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or *presence*,'" *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (emphasis added). Although *Ostrem* and *Parker* turn on an individual's presence at the scene of the crime, both cases explain that presence must be intended to aid a principal in order to rise to the level of aiding and abetting.[3] In *Ostrem*, for example, the court held that "presence can be sufficient to impose liability *if it*

---

[3] To the extent that *Ostrem* or *Parker* might suggest that the intent to aid could be inferred from presence, I take the Minnesota Supreme Court at its word that more is required to sustain a conviction. *See State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007) ("[T]o prove that Mahkuk aided and abetted the shooting and killing of the two victims, the state was required to prove more than Mahkuk's intentional presence at the scene of the crime. The state had to prove, beyond a reasonable doubt, that Mahkuk . . . intended his presence or actions to further the commission of that crime.")

-13-

*somehow aids the commission of the crime*." 535 N.W.2d at 925 (emphasis added). And although the *Parker* court noted that "inaction is often the distinguishing characteristic of the aider and abettor and is encompassed within the statute," it went on to explain that, "[i]n this regard the 'lookout' is a classic example." 164 N.W.2d at 641. These statements are in line with federal law. *See, e.g.*, *United States v. Ruiz-Zarate*, 678 F.3d 683, 690–91 (8th Cir. 2012).

Second, Gammell argues that Minnesota conflates conspiracy liability and aiding and abetting liability because the Minnesota aiding and abetting statute extends liability to one who "conspires with" another to commit a crime. *See* Minn. Stat. § 609.05. Conspiracy and aiding and abetting are not coterminous, *see Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949), and if Minnesota used this language in its aiding and abetting statute to prove conspiracy against an individual and then convict him as an accomplice, its aiding and abetting doctrine would likely be broader than the generic version. However, the statute's use of the word "conspires" to describe a potential method of aiding and abetting, on its own, does not persuade me that it conflates conspiracy liability, for which Minnesota has a separate statute, with aiding and abetting liability. *See* Minn. Stat. § 609.175. Gammell cites no case in which Minnesota has applied its aiding and abetting statute in this way and we require more than a theoretical possibility that a statute applies broadly before we determine that it is overbroad under the ACCA. *United States v. Swopes*, 886 F.3d 668, 671 (8th Cir. 2018) (en banc).

Because I do not find anything "special" about Minnesota's aiding and abetting doctrine, I concur in the court's judgment that Gammell's conviction for aiding and abetting second-degree burglary qualifies as an ACCA predicate.

_____