# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-1814
_____

United States of America

*Plaintiff - Appellee*

v.

Carlos Patricio Luna

*Defendant - Appellant*

_____

No. 18-3302
_____

United States of America

*Plaintiff - Appellee*

v.

Preston Ellard Forthun

*Defendant - Appellant*

_____

No. 18-3304
_____

United States of America

*Plaintiff - Appellee*

v.

Abdisalan Abdulahab Hussein

*Defendant - Appellant*
_____

Appeals from United States District Court
for the District of Minnesota
_____

Submitted:  October 17, 2019
Filed: August 10, 2020
_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

This case is about a recruitment-and-kickback scheme involving car-accident victims, a chiropractic clinic, and automobile insurers.  Three members of the scheme were convicted of mail and wire fraud.  In these consolidated appeals, the defendants' convictions stand, but we send several sentencing issues back for another look.

I.

Before delving into the issues on appeal, we begin with a description of the fraud itself and the legal backdrop against which it operated.

A.

Minnesota has a unique no-fault automobile-insurance system.  Among other things, the No-Fault Act requires every insurer to provide a minimum of $20,000 per

person to cover "reasonable" and "necessary" medical expenses, regardless of who is at fault for an automobile accident. Minn. Stat. § 65B.44, subd. 1(a), 1(a)(1), 2(a). What this means is that insurers pay the medical expenses of their *own* policyholder. Minn. Stat. § 65B.42(1).

From the perspective of health-care providers, there is much to like. Reimbursements often exceed those from other sources, and there is no limit on the number of times a policyholder can seek treatment for an injury. It is true that insurers have ways of uncovering whether medical treatment is unreasonable or medically unnecessary, such as by requiring a policyholder to provide further information under oath or undergo an independent medical examination. Minn. Stat. § 65B.56, subd. 1. But absent a red flag suggesting possible fraud, insurance companies typically pay their bills because they assume that they can trust what providers send them.

There are other safeguards in the statutory scheme, too. For example, one provision bans certain "[u]nethical practices," including, with limited exceptions, "initiat[ing] direct contact" with accident victims in order to "influenc[e them] to receive treatment." Minn. Stat. § 65B.54, subd. 6(a). The prohibition also extends to having others—known in the industry as runners—recruit on a health-care provider's behalf. A "runner" is someone who is offered compensation for "directly . . . solicit[ing] prospective patients . . . at the direction of, or in cooperation with, a health care provider when [they] know[] or ha[ve] reason to know" that the purpose is to seek reimbursement under an automobile-insurance policy. Minn. Stat. § 609.612, subd. 1(c), (2); *see* Minn. Stat. § 65B.54, subd. 6(a)–(c) (providing exceptions). Once a runner recruits someone, all subsequent health-care services are "noncompensable and unenforceable as a matter of law." Minn. Stat. § 609.612, subd. 2.

B.

The specific cases before us revolve around one clinic in particular: the Comprehensive Rehab Centers of Minnesota, which was co-owned by two chiropractors, Dr. Preston Forthun and Dr. Darryl Humenny. From at least 2010 onward, Carlos Luna, Abdisalan Hussein, and others recruited accident victims to the clinic's two Minneapolis locations. Recruiters often identified prospects through accident reports purchased by the clinic and facilitated attendance by providing other services, such as transportation to and from appointments. The clinic paid them for their efforts.

Patients were also paid after they attended a certain number of sessions. The doctors would pay recruiters (typically in cash), who would then pay kickbacks to patients. Less frequently, accident victims approached the doctors directly and were brought into the cash-for-treatment scheme without the involvement of recruiters. In both cases, the hope was that a patient would eventually attend 30 to 40 sessions and exhaust the entire $20,000 guaranteed by the No-Fault Act.

The treatment for most patients was the same, regardless of their specific type of injury. Typically, it would involve an x-ray at the first exam, a treatment plan of three sessions weekly for four weeks, and then a second exam. Repeat, re-exam, repeat was the practice—until the doctors treated the patient "as many times as possible."

C.

Eventually, law enforcement caught on. Operation Backcracker, as it came to be known, targeted multiple health-care providers across the Twin Cities and led to a number of indictments. *See, e.g.*, *United States v. Kidd*, 963 F.3d 742 (8th Cir. 2020). Among those indicted were Forthun, Luna, and Hussein, who were charged with mail and wire fraud; conspiracy to commit both crimes; and aiding and abetting the conspiracy. 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1349

(conspiracy), 2 (aiding and abetting).  Dr. Humenny served as a key government witness at the defendants' joint trial.

The jury found the defendants guilty on all counts.  Forthun received five years in prison.  Guilty as co-conspirators and accomplices to mail and wire fraud, Hussein and Luna received 15-month and time-served sentences, respectively.  All three appeal their convictions, and Forthun and Hussein challenge their sentences.

## II.

The first issue is the sufficiency of the evidence.  The analysis begins with the mail- and wire-fraud statutes, which as relevant here, require an individual to have "devised or intend[ed] to devise any scheme or artifice to defraud" using mail or wire communication "for the purpose of executing" the scheme.  18 U.S.C. §§ 1341, 1343.  The defendants start with the argument that the government never proved that there was a "scheme to defraud."  And even if there were one, Luna and Hussein claim that they did not play a role in it.  We review the sufficiency of the evidence de novo, "viewing [the] evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict."  *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003).

## A.

We begin with the scheme-to-defraud requirement.  A scheme is a "deliberate plan of action" or "course of conduct."  *United States v. Whitehead*, 176 F.3d 1030, 1037–38 (8th Cir. 1999) (approving this definition in a jury instruction); *United States v. Clapp*, 46 F.3d 795, 803 (8th Cir. 1995) (same).  "To defraud" someone requires material, affirmative misrepresentations or active concealment of material information for the purpose of inducing action.  *United States v. Steffen*, 687 F.3d 1104, 1111, 1115 (8th Cir. 2012); *see Neder v. United States*, 527 U.S. 1, 22–23 (1999) (explaining that the fraud statutes incorporate the materiality element of

common-law fraud); Restatement (Second) of Torts §§ 525, 550 (Am. Law Inst. 1977). Taken together, the government had to prove that: (1) there was a "deliberate plan of action" or "course of conduct" to hide or misrepresent information; (2) the hidden or misrepresented information was material; and (3) the purpose was to get someone else to act on it. It proved all three here.

First, there was plenty of evidence "of planning" by those involved. *United States v. Goodman*, 984 F.2d 235, 237 (8th Cir. 1993) (citation omitted). Forthun and Humenny created an elaborate web of lies to keep insurance companies in the dark about their use of recruiters and kickbacks. One example from trial is particularly illustrative. During a routine inspection, an insurance company representative asked whether the clinic used runners to attract business. Rather than answering honestly, Forthun replied that they did not "approach him." The jury could have concluded that this misrepresentation, like many others, was part of a larger "plan" or "course of conduct" aimed at misleading insurers.

Active concealment also played a significant role. Recruiters were paid in cash to avoid a "paper trail." If insurance companies questioned patients, recruiters coached them on what to say, including how to respond to requests for information under oath or attendance at independent medical examinations. From all appearances, the operation was a well-oiled machine.

Second, the information withheld had "a natural tendency to influence, or [was] capable of influencing" an insurer's decision to pay. *Neder*, 527 U.S. at 16 (citation omitted). Multiple insurance representatives testified at trial. The consistent theme was that the use of recruiters and kickbacks creates multiple concerns for insurers. One is that accident victims might seek treatment, not because they actually need it, but based on pressure from recruiters or a desire to put money in their own pockets. Another is that health-care providers may inflate their fees to cover the extra expenses from compensating recruiters and paying kickbacks to patients. It creates a vicious cycle: it costs money to get patients in the door, even more to keep them there, and insurers are left footing the bill.

All of this information had a bearing on whether insurers had to pay. If recruiters like Luna and Hussein qualified as "runners," then insurers had no obligation to reimburse the clinic for *any* services provided. Minn. Stat. § 609.612, subd. 2; *Kidd*, 963 F.3d at 745–48. It goes without saying that information completely relieving them of the obligation to pay was material.

Insurers also have no obligation to pay for medical services that are unreasonable, medically unnecessary, or never provided. *See* Minn. Stat. § 65B.44, subd. 1(b), 2(a); *see also Kidd*, 963 F.3d at 747. Even if recruiters like Luna and Hussein were not technically "runners" under Minnesota's restrictive definition, employing recruiters, setting minimum attendance requirements, and paying kickbacks made it more likely that the chiropractic services were noncompensable for one of these reasons. Insurance representatives testified, in fact, that the use of recruiters and kickbacks is "suspicious" activity, regardless of whether it violates state law, and often leads to further investigation, sometimes by special units. Even this underlying information, in other words, was material.[1] *See Neder*, 527 U.S. at 16; *Kidd*, 963 F.3d at 747.

It makes no difference, at least in evaluating the sufficiency of the evidence, that insurance representatives admitted that some claims may still have been compensable. After all, the same group of insurance representatives testified that, with a fuller picture of the clinic's practices, insurers would have investigated. This fact alone shows that the information withheld had a "tendency to influence" their

---

[1]The government's evidence supported a single cohesive theory of materiality, so there was no risk that jurors convicted the defendants based on inconsistent rationales. *United States v. Lasley*, 917 F.3d 661, 664–65 (8th Cir. 2019) (per curiam) (reversing when there was a "genuine risk" that the jury did not agree on a single set of facts supporting liability (citation omitted)); *see also United States v. Davis*, 154 F.3d 772, 783 (8th Cir. 1998) ("[A] general unanimity instruction is usually sufficient to protect a defendant's [S]ixth [A]mendment right to a unanimous verdict.").

actions, even when it had no effect on whether they ultimately paid. *Neder*, 527 U.S. at 16 (citation omitted).

Third, these actions were done "for the purpose of" defrauding insurance companies. 18 U.S.C. §§ 1341, 1343. Humenny instructed patients to tell insurers that "a former patient" referred them, because "it was one way [to] deceive" them into "pay[ing] the bills." When asked why they screened out accident victims who had "wait[ed] too much time" to seek treatment, Humenny responded that "it kind of lends to the fact that you may not have been injured," which is "a red flag" for insurance companies. The upshot is that the lies were aimed at keeping the money flowing.

B.

Even if a scheme to defraud existed, the government still had to establish that Hussein and Luna played a role in it. Based on the jury verdict, it meant proving that they were accomplices and co-conspirators in the fraud.

There was plenty of evidence that both men participated in the scheme. They played an active role in recruiting accident victims, paying kickbacks, and coaching patients to deceive insurance companies, all in an effort to line their own pockets. These facts allowed the jury to infer that Luna and Hussein had knowledge of the illegal scheme and knowingly participated in it. *See United States v. Hamilton*, 929 F.3d 943, 946 (8th Cir. 2019) (requiring a conspirator to know of the illegal agreement and knowingly participate); *United States v. Hively*, 437 F.3d 752, 764 (8th Cir. 2006) (explaining that "knowing[] participat[ion]" is necessary for accomplice liability).

Moreover, there was evidence separately implicating each man. One former patient testified that Luna instructed her not to tell anyone that he had initially approached her about visiting the clinic. *See Kidd*, 963 F.3d at 750 (noting that some "irregular behavior" can "support an inference that [the defendant] knew of the illicit

- 8 -

activity and acted with intent to defraud"). Hussein participated in a similar arrangement with another clinic, which was properly admitted for the limited purpose of showing that he understood how these types of schemes work. *See* Fed. R. Evid. 404(b)(2).

\* \* \*

Based on the evidence, a jury could conclude beyond a reasonable doubt that Forthun committed mail and wire fraud, that both Luna and Hussein were his accomplices, and that all three entered into a conspiracy to defraud insurers. *See Washington*, 318 F.3d at 852.

III.

The sentencing issues come next. Forthun challenges all three parts of his sentence: a 60-month prison term that he is currently serving, $1,553,500 in restitution, and an order to forfeit $1,180,666. Hussein, for his part, asks us to reverse the district court's determination that he owes $187,277 in restitution.[2]

A.

For both defendants, their primary complaint is the district court's loss calculations. They argue that the failure to include an offset for services that were medically necessary and reasonable led the district court to overestimate the amount of actual and intended losses from the fraud. In addressing this argument, we review the court's legal conclusions de novo and its factual findings for clear error. *United States v. Gammell*, 932 F.3d 1175, 1180 (8th Cir. 2019); *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006).

---

[2]Hussein's challenge to his 15-month prison term became moot once he was released from prison. *See United States v. Hill*, 889 F.3d 953, 954 (8th Cir. 2018).

1.

The district court used "intended loss[es]" to calculate the length of Forthun's sentence. U.S.S.G. § 2B1.1, cmt. n.3(A) (explaining that the offense level for fraud depends in part on "actual loss or intended loss," whichever is "greater"). These losses were all about his intent: what the fraud was *designed* to cause the insurance companies to lose. *United States v. Wells*, 127 F.3d 739, 746 (8th Cir. 1997) (explaining that "intended loss[es]" are those that "the defendant intended to cause to the victim[s]" of the fraud); *accord United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (Gorsuch, J.).

Actual losses came into play when the district court ordered both defendants to pay restitution. *See* 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii) (requiring restitution for property-offense victims), 3664(f)(1)(A) (specifying that restitution is "the full amount of each victim's losses"). Here, the focus was on what actually happened: how much the insurance companies *in fact* lost due to each defendant's fraudulent actions. *Gammell*, 932 F.3d at 1180 (describing "actual loss[es]" as "the amount of loss *actually* caused by the defendant's offense" (citation omitted)).

Following these definitions, the district court used the same basic formula for both. One variable remained constant: the estimated number of patients each man was responsible for bringing into the clinic through "kickbacks or referrals." As the mastermind, Forthun was responsible for all 500 patients offered cash for treatment. For Hussein it was just 65, the total number of accident victims he directly recruited.[3]

---

[3]Of the 65 patients, 30 came from his work with another clinic. After the government agreed to dismiss some charges against him, he agreed that these patients could be added to his total. The district court did not clearly err in using a patient ledger from the other clinic and "investigative interviews" to arrive at the 65-patient total. 18 U.S.C. § 3661 (placing no limits on relevant evidence at sentencing).

The second variable changed depending on the type of loss involved. For intended losses, the court used the average amount billed per patient. *See* U.S.S.G. § 2B1.1, cmt. n.3(C) ("The court need only make a reasonable estimate of the loss."); *United States v. Lamoreaux*, 422 F.3d 750, 756 (8th Cir. 2005) (approving the district court's finding that "loss could be estimated" through "basic economics" under the Guidelines). For actual losses, the choice was average reimbursement rates. *See United States v. Carpenter*, 841 F.3d 1057, 1060–61 (8th Cir. 2016) (describing the "wide discretion" courts have to calculate restitution (citation omitted)).

Simple multiplication yielded the final figures. The district court estimated Forthun's intended losses at $2,726,500 based on 500 patients and an average billing rate of $5,453. The actual losses were lower, $1,553,500, using an average reimbursement rate of $3,107. Finally, the district court held Hussein accountable for 35 patients at an average reimbursement rate of $3,107, and 30 patients at his prior clinic, with an average reimbursement rate of $2,617. The total came to $187,277.

2.

These calculations were a reasonable starting point, but as the defendants explain, the district court did not complete its analysis. It did not make an allowance for the legitimate, compensable services provided by the clinic. The Sentencing Guidelines, for example, provide an offset for the "fair market value of . . . the services rendered . . . to the victim."[4] U.S.S.G. § 2B1.1, cmt. n.3(E)(i) (providing

---

[4]The victims of the fraud are the insurance companies, not those who underwent treatment for their injuries. The phrase "fair market value of the services rendered" is an awkward fit with a third-party payor. After all, when third-party payors are the victims, as in this case, they do not directly receive the services, so there is arguably no "fair market value" to them. But this line of argument ignores an insurer's statutory duty to pay for reasonable and medically necessary treatments. Minn. Stat. § 65B.44, subd. 2(a). Treatments arising out of a statutory obligation to

- 11 -

for "[c]redits" in all loss calculations under the Sentencing Guidelines); *United States v. Liveoak*, 377 F.3d 859, 867 (8th Cir. 2004). Similarly, with restitution, anything the insurance companies would have had to pay, regardless of the defendants' actions, cannot be a loss caused by the fraud. *See United States v. Frazier*, 651 F.3d 899, 904 (8th Cir. 2011) (emphasizing that restitution is "compensatory" and courts "cannot award the victim a windfall" (internal quotation marks and citations omitted)). We need not decide whether these two offsets are the same, only that they both may be available here.

None of the district court's findings rule out this possibility. Far from determining that the services lacked fair market value (intended losses) or that insurers had no obligation to pay (actual losses), the district court did not even sort out what percentage of the services were noncompensable—as medically unnecessary; unreasonable; never provided; or for some other reason, like use of a runner. *See* Minn. Stat. §§ 65B.44, subd. 2(a), 609.612, subd. 2; *see also Kidd*, 963 F.3d at 753 (using "the number of patients who were recruited by [the defendant's] runners").

The danger is overinclusiveness. The district court found that the clinic attracted 500 patients "through kickbacks or referrals." But some of those patients approached the clinic on their own and asked for a kickback—a practice that is not directly prohibited by the No-Fault Act. To the extent that the chiropractic services provided to them were reasonable and medically necessary, they would have been compensable.

The same is true even when patients were recruited to the clinic by someone else. To be sure, once "runner[s]" are involved, it taints the relationship and automatically relieves insurers of their statutory duty to pay. Minn. Stat. § 609.612, subd. 2; *Kidd*, 963 F.3d at 746. But not all recruiters are runners under Minnesota's

_____

pay arguably have value to insurers. The extent to which they do is an issue for the district court to consider on remand.

restrictive statutory definition.  *See* Minn. Stat. §§ 65B.54, subd. 6, 609.612, subd. 1(c).  Without any findings distinguishing between the two, we cannot be sure that the loss calculations are accurate.

The fact that the runner statute changed midway through the scheme only adds to the difficulty.  Toward the end, services were noncompensable once a third party "directly procure[d] or solicit[ed] prospective patients" for "pecuniary gain" and "kn[e]w[] or ha[d] reason to know that" the purpose was to "obtain . . . benefits under or relating to" an automobile-insurance contract.  Minn. Stat. § 609.612, subd. 1(c).  Before then, the definition was even more restrictive: the third party also had to know that the health-care provider's purpose was to "fraudulently" obtain benefits.  Minn. Stat. § 609.612, subd. 1(c) (2004); *see* 2012 Minn. Laws 1005–06 (striking the term "fraudulently" and setting January 1, 2013 as the amendment's effective date).  This distinction never factored into the district court's analysis.

In sum, offsets could have made a difference, both to the length of Forthun's sentence and to the size of the restitution awards.  When the district court failed to consider the possibility, it created the risk that each may be too high.  For this reason, we vacate and remand for resentencing.

## B.

Forfeiture is a different story.  The district court ordered Forthun to forfeit $1,180,666 in proceeds from the fraud.  The first two challenges to the order are procedural: the government waived the opportunity to seek forfeiture and, in any event, filed its motion too late.  First, the government did not waive its right to seek forfeiture because it provided notice in the indictment.  Fed. R. Crim. P. 32.2(a).  Second, forfeiture is mandatory for "[f]ederal health care offense[s]," so the government was not required to file a motion.  *See* 18 U.S.C. §§ 24(a)(2)–(b), 982(a)(7).

The third challenge is to the amount, and specifically, whether it was excessive.  The argument is a familiar one: some of the chiropractic services were compensable, so Forthun should have received some sort of offset.  Successful elsewhere, it fails here, primarily because of the difference between restitution and forfeiture.  *See United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344–45 (11th Cir. 2009).  The focus shifts from the "victim's losses," 18 U.S.C. § 3664(f)(1)(A), to the "*gross* proceeds traceable to the commission of the offense," *id.* § 982(a)(7) (emphasis added).  The reimbursements for all 500 patients were "gross proceeds" of the fraud itself, so the forfeiture order stands.

## IV.

We affirm the judgment of the district court in Luna's case.  In the other two, we affirm the convictions and the forfeiture order, vacate the restitution orders, vacate Forthun's sentence, and remand for resentencing consistent with this opinion.

_____