# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-1275
_____

United States of America

*Plaintiff - Appellee*

v.

Abdisalan Abdulahab Hussein, also known as Abdisalan A. Hussein

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 9, 2023
Filed: August 23, 2023
_____

Before SHEPHERD, STRAS, and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

This case is about the amount of restitution owed by a participant in a recruitment-and-kickback scheme aimed at defrauding automobile-insurance

companies. The district court[1] ordered restitution for every chiropractic patient that Abdisalan Hussein recruited from 2013 onward. We affirm.

## I.

Hussein ended up at a Twin Cities chiropractic clinic after an automobile accident. The visit resulted in a job: the clinic hired him to recruit patients. And then another one did too.

Hussein's role was to bring in as many accident victims as possible. Each new patient could undergo treatment up to $20,000, the limit of basic economic benefits available under most Minnesota automobile-insurance policies. *See* Minn. Stat. § 65B.44, subd. 1(a)(1) (requiring a minimum of $20,000 in coverage); *see also United States v. Luna*, 968 F.3d 922, 924–25 (8th Cir. 2020). In return, Hussein received a kickback of up to $1,500, a portion of which he shared with patients who returned for multiple visits.

Enter "Operation Backcracker," a federal investigation targeting insurance fraud. If Hussein "qualified as [a] 'runner[]' [under Minnesota law], then insurers had no obligation to reimburse the clinic[s] for *any* services provided." *Luna*, 968 F.3d at 927 (quoting Minn. Stat. § 609.612, subd. 2). After a jury trial, the district court ordered Hussein to pay $187,277 in restitution to the insurance companies he defrauded. *See* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy), 2 (aiding and abetting).

The restitution order has been a point of contention throughout. The first time around, the district court ordered restitution based on every accident victim Hussein recruited, 65 in total. On appeal, we vacated the award and sent the issue back for

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

another look.  *See Luna*, 968 F.3d at 931.  As we explained, the main problem was "overinclusiveness" because "not all recruiters are runners."  *Id.* at 930.

On remand, the amount of restitution decreased.  This time, the district court concluded that Hussein qualified as a runner for only 53 of the 65 victims,[2] which dropped the award to $155,864.  Hussein, for his part, has adopted an all-or-nothing strategy: he does not believe he owes a single penny of restitution.

## II.

The linchpin of Hussein's argument is that he was never a runner.  After all, we made clear in the first appeal that "once runner[s] are involved, it taints the relationship and automatically relieves insurers of their duty to pay."  *Luna*, 968 F.3d at 930 (quoting Minn. Stat. § 609.612, subd. 2).  In statutory terms, once a runner recruits someone, every health-care service provided afterward becomes "noncompensable and unenforceable as a matter of law."  Minn. Stat. § 609.612, subd. 2.

A runner is someone who "directly procures or solicits prospective patients" for "pecuniary gain" and "knows or has reason to know that the provider's purpose" is to "obtain . . . benefits under or relating to" an automobile-insurance contract.  *Id.* § 609.612, subd. 1(c).  Whether Hussein qualified as a runner for the 53 patients he recruited starting in 2013 is a factual finding we review for clear error.  *See United States v. Gammell*, 932 F.3d 1175, 1180 (8th Cir. 2019); *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006).

---

[2]Minnesota changed the definition while the conspiracy was ongoing.  Under the old definition, the runner had to know that the health-care provider's purpose was to "fraudulently" obtain benefits.  Minn. Stat. § 609.612, subd. 1(c) (2004); *see* 2012 Minn. Laws 1005–06 (striking the term "fraudulently" as of January 1, 2013).  The parties now agree that Hussein was not a runner under the pre-2013 definition, so he is not responsible for the 12 patients he recruited back then.

Our opinion in *Luna* does some of the work. As we explained there, Hussein had "an active role in recruiting accident victims." 968 F.3d at 928. He also helped "coach[] patients to deceive insurance companies." *Id.* "[A]ll in an effort to line [his] own pockets." *Id.*

The trial record completes the picture. Hussein received up to $1,500 per patient he recruited, which satisfies the pecuniary-gain requirement. *See* Minn. Stat. § 609.612, subd. 2. A series of text messages establishes the remaining elements. In one, Hussein texted with a clinic owner about how one patient was "a piece of shit" for not coming to enough appointments. When the clinic owner later said she was "pray[ing] for some ice and snow" to bring in more clients, Hussein replied that he had "been praying for [the] last four weeks." It was reasonable to conclude from these messages that Hussein "directly procure[d]" these patients with at least a "reason to know," if not actual knowledge, that the provider's purpose was to obtain benefits under an automobile-insurance contract. *Id.* § 609.612, subd. 1(c).

## III.

From there, Hussein turns his attention to two statutory exceptions. *See id.* § 609.612, subd. 1(c) (explaining that "[t]he term runner . . . does not include a person who solicits or procures clients . . . consistent with the requirements of Section 65B.54, subdivision 6"); *id.* § 65B.54, subd. 6 (detailing "[u]nethical practices" for automobile-insurance claims). One covers situations in which "an injured person voluntarily initiates contact with a licensee," Minn. Stat. § 65B.54, subd. 6(a), and the other "contact with friends or relatives, or statements made in a social setting," *id.* § 65B.54, subd. 6(c)(3). We have a split standard of review in considering these exceptions: de novo for legal questions and clear error for any underlying factual findings. *See Gammell*, 932 F.3d at 1180.

A.

We start with the voluntary-contact exception. The general rule is that a "licensed health care provider," referred to as a "licensee" in the statute, cannot "initiate direct contact" with "any person who has suffered an injury arising out of the maintenance or use of an automobile." Minn. Stat. § 65B.54, subd. 6(a). The no-contact rule applies regardless of "whether . . . the licensee individually or [someone] on behalf of the licensee . . . including a . . . runner" initiates it. *Id.* An "injured person," on the other hand, can contact a "licensee" anytime. *Id.*

Hussein does not dispute that the general rule applies to him. Rather, his theory is that the voluntary-contact exception saves him because some accident victims called him first. Even if they did, he still cannot benefit because voluntary contact with a "*licensee*," a clear reference back to a "licensed health care provider," is all it covers. *Id.* § 65B.54, subd. 6(a) (emphasis added). Runners do not count, and the statute is unambiguous on that point. *See id.* § 609.612, subd. 1(c) (defining "runner" without any reference to who initiated the contact); *see also Muscarello v. United States*, 524 U.S. 125, 138 (1998) (explaining that the rule of lenity should only be invoked when the court can make "no more than a guess as to what [the legislature] intended" (citation omitted)).

B.

Much the same goes for the friends-relatives-or-social-settings exception. Minn. Stat. § 65B.54, subd. 6(c)(3). But unlike the one covering voluntary contact, it applies to everyone, including runners.

The problem for Hussein is that the government met its "ultimate burden of proving [the] loss." *United States v. Karie*, 976 F.3d 800, 806 (8th Cir. 2020) (citation omitted). Once it did, the burden then shifted to Hussein to prove the exception applied. *See id.* (explaining that the "burden of producing evidence of any legitimate services" is on the defendant (citation omitted)); *see also United States v.*

-5-

*Archer*, 671 F.3d 149, 173–74 (2d Cir. 2011) (explaining in a fraud case that the government bears the burden of proving "a *prima facie* case that each . . . victim [was] entitled to restitution," and the defendant bears the burden of rebutting it).

The evidence, as it stands now, says little about Hussein's relationship with any of the accident victims he recruited. And to the extent it does, it suggests that the exception does not apply. Consider one patient who testified that she called him about chiropractors even though she did not know him. Or the person he referred to as "a piece of shit" for ending her visits. Neither were friends. *See The American Heritage Dictionary of the English Language* 703 (5th ed. 2016) (defining "friend" as a "person whom one *knows*, *likes*, and trusts" (emphases added)). And it goes without saying that being a "helpful person" in the Somali community does not transform every interaction into one "made in a social setting." Minn. Stat. § 65B.54, subd. 6(c)(3).

IV.

We accordingly affirm the judgment of the district court.

_____