# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3221

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Jerrell Smith

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: April 18, 2019
Filed: July 3, 2019

_____

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

After Jason Smith pleaded guilty to passing counterfeit securities, *see* 18 U.S.C. § 513(a), the district court[1] sentenced him to 120 months in prison and ordered him to pay almost $55,000 in restitution. Smith claims that the court's

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

intended-loss calculation under the Sentencing Guidelines was too high, *see* U.S.S.G. § 2B1.1(b), and that the restitution amount should have been lower, *see* 18 U.S.C. §§ 3663A, 3664. Because neither determination was clearly erroneous, we affirm.

## I.

Two years ago, Smith decided to get ahead of the pack and announce his candidacy for President of the United States. Operating under the alias "Joshua Gaters," his plan was to run in the 2020 election. But rather than finance his campaign through political contributions, personal funds, or other traditional sources, Smith chose less honest means. He used bad checks for campaign-related expenses, including office space, vehicles, and compensation for his staffers. Checks to vendors bounced too. When he turned to his personal credit cards, the campaign's financial condition did not improve. At one point, he directed a staffer to acquire a private jet, but when she attempted to place a $2.3 million deposit with NetJets, Smith's credit card was declined. Eventually, local and federal authorities caught on to Smith's scheme and used his disgruntled staffers and other victims to make the case against him.

After Smith pleaded guilty and the district court heard testimony at sentencing from a federal investigator and two victims, the court concluded that Smith intended to cause a total loss of approximately $2.7 million, the largest portion of which was the failed NetJets transaction. This figure resulted in an advisory Sentencing Guidelines range well above the statutory maximum of 120 months, *see* U.S.S.G. § 2B1.1(b)(1)(I); 18 U.S.C. § 513(a), which is what the court gave him. It also ordered him to pay restitution to most of the individuals and companies that he defrauded.

II.

Smith challenges both decisions. He insists that he did not intend to inflict financial harm on anyone when he attempted to rent a jet and that he should not have to pay restitution to several of his victims. We review both arguments for clear error and will reverse only if the court's findings were not supported by substantial evidence, were based on an erroneous view of the law, or leave us with a firm and definite conviction that a mistake has been made. *See United States v. Martinez*, 690 F.3d 1083, 1086 (8th Cir. 2012); *United States v. DeRosier*, 501 F.3d 888, 896 (8th Cir. 2007).

A.

We begin with the district court's intended-loss calculation. According to the Sentencing Guidelines, the offense level for fraud and other similar property crimes depends on the greater of the "actual" or "intended loss[es]," the latter of which includes any "pecuniary harm that [Smith] purposely sought to inflict" even if it "would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. n.3(A); *see also United States v. Hartstein*, 500 F.3d 790, 798 (8th Cir. 2007) (explaining that the "defendant's actual, subjective intent . . . should drive [the] analysis").

Trying to rent a jet without paying for it satisfies this definition. The record shows that Smith gave a staffer his credit card, "repeatedly urge[d] her to get the . . . jet under contract," and told her to do "whatever it t[ook] to secure [it]." And were there any doubt about Smith's intentions, he fraudulently acquired other expensive items—including a house, office space, and several vehicles—through similar means. On this record, the district court did not clearly err in counting this transaction as an intended loss.[2]

---

[2]To be sure, the district court concluded that Smith did not intend to harm a private-security firm that he considered hiring, even though that deal fell through too.

B.

The district court also did not clearly err in the amount of restitution it ordered. *See United States v. Adejumo*, 848 F.3d 868, 870 (8th Cir. 2017) (explaining that restitution is authorized "only to the extent sufficient evidence has proven [a victim's] ultimate loss"). If the court "reasonably estimat[ed] the loss," we will affirm. *United States v. Alexander*, 679 F.3d 721, 729 (8th Cir. 2012) (citation omitted).

The estimates were reasonable. In many instances, the government simply presented actual copies of Smith's bad checks to prove the amount of restitution he owed.[3] When the checks themselves were not available, the government called witnesses who were familiar with the fraud, such as his running mate, a former staffer, and the government agent who investigated the case. *See Adejumo*, 848 F.3d at 870–71 (recognizing that testimonial evidence can be used to calculate the amount of restitution).

Indeed, the court approached the issue of restitution with considerable caution, explaining in one instance that the amount ordered likely "understat[ed]" the victim's losses, *cf. United States v. Emmert*, 825 F.3d 906, 911 (8th Cir. 2016) (approving a restitution award that "was a reasonable and *likely underestimated* sum" (emphasis added)), and in another that "the proof [was] just too sketchy" to

---

In dealings with that firm, however, the staffer never attempted payment, told the firm that the campaign did not need its services, and ended up hiring another firm instead. The differences between this transaction and the NetJets negotiations are meaningful, even if Smith would have us overlook them.

[3]Smith complains that the government did not provide copies of two of the checks until the sentencing hearing, after it was too late for him to adequately respond. But he fails to explain how receiving copies earlier would have allowed him to show that the restitution award should have been lower, as he now claims.

award restitution. Given the court's careful consideration of each item of restitution, Smith has offered us no reason to disturb its findings.

III.

We accordingly affirm the judgment of the district court.

_____