# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-2715
_____

United States of America,

*Plaintiff - Appellee*,

v.

Alberto Quinto-Pascual,

*Defendant - Appellant*.

_____

Appeal from United States District Court
for the Northern District of Iowa - Eastern

_____

Submitted: April 16, 2021
Filed: August 16, 2021

_____

Before SMITH, Chief Judge, COLLOTON and ERICKSON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Alberto Quinto-Pascual pleaded guilty to two firearm offenses. The district court[1] imposed a sentence of 180 months' imprisonment. Quinto-Pascual appeals his sentence, but we conclude that there was no reversible error, and affirm the judgment.

The prosecution arose from Quinto-Pascual's report to police in Waterloo, Iowa, that a person identified by his initials as A.F. shot himself in the early hours of May 10, 2019. Quinto-Pascual disclosed to police that the shooting occurred in a house where he stayed on occasion, and that officers could find the gun under a car in a nearby alley. Police found A.F. in a room with a bullet wound above his right ear. Police also found a pipe with methamphetamine residue in the house. Quinto-Pascual initially denied that the gun was his, but later admitted that he owned it. A.F. died from his injury on May 11, 2019.

In June 2019, a grand jury charged Quinto-Pascual with possession of a firearm as an unlawful user of a controlled substance and possession of a firearm with an obliterated serial number. 18 U.S.C. § 922(g)(3), (k). Quinto-Pascual pleaded guilty, and the case proceeded to sentencing. The parties disputed the proper base offense level under the advisory guidelines. The government argued that the court should apply the offense level for murder under a cross-reference in the firearms guideline. Under USSG § 2K2.1(c)(1)(B), if the defendant used "any firearm or ammunition cited in the offense of conviction in connection with the commission" of another offense and death resulted, the district court is to apply the most analogous guideline from USSG § 2A1. The prosecution argued that Quinto-Pascual intentionally shot A.F., and that the guideline for first-degree murder or second-degree murder should apply. *See* USSG §§ 2A1.1-.2.

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

After a hearing, the district court found by a preponderance of the evidence that Quinto-Pascual intentionally shot A.F. with malice aforethought. The court applied the guideline for second-degree murder, USSG § 2A1.2, and calculated an advisory guideline range that exceeded the statutory maximum term of fifteen years, so the guideline sentence became 180 months' imprisonment. *See* 18 U.S.C. § 924(a)(1)(B), (2); USSG § 5G1.1(a). The court then imposed a term of 180 months.

On appeal, Quinto-Pascual's sole argument is that the court erred in finding that he shot A.F. We review factual findings for clear error and reverse if the record leaves us with a firm and definite conviction that the district court made a mistake. *See United States v. Smith*, 929 F.3d 545, 547 (8th Cir. 2019). We will not reverse merely because we "would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

The crux of Quinto-Pascual's argument is that the evidence supported his account that A.F. accidentally shot himself. At the sentencing hearing, Quinto-Pascual testified to his version of events. He met A.F. for the first time at a bar on the night of May 9, 2019. They drank beer, played pool, and eventually proceeded to the bar's restroom. In the restroom, A.F. revealed that he was carrying a methamphetamine pipe, and Quinto-Pascual suggested that they leave the bar and smoke methamphetamine. Quinto-Pascual then drove the pair to a nearby house.

Quinto-Pascual testified that he entered the house, retrieved his gun, and handed the unloaded gun to A.F. On this account, A.F. placed the gun to his head and pulled the trigger several times. Quinto-Pascual took the gun back and gave a pipe with methamphetamine to A.F. Quinto-Pascual then instructed A.F. on how to open the gun, and Quinto-Pascual loaded it with bullets to "show it off." Quinto-Pascual attempted to remove the bullets before giving the gun back to A.F., but testified that a bullet might have been stuck in the chamber. Quinto-Pascual said that he then

momentarily faced away from A.F., heard a gunshot, and turned around to see that A.F. had shot himself.

Quinto-Pascual testified that while he was in a state of shock, he grabbed the gun and wiped it down. He also picked up a pipe before leaving the house. He placed the gun under a car in an alley behind the house, and fled on foot to a home where his friends, J.C. and S.M., were staying. He waited there until S.M. let him into the house. Eighteen minutes after arriving at the house, Quinto-Pascual called the police when J.C. suggested he do so.

In a detailed ruling, the district court rejected Quinto-Pascual's testimony and found that he shot A.F. based on four categories of evidence. First, the court found that expert testimony established that the gun was more than inches from A.F., and that it was improbable that A.F. "contorted his body" to shoot himself. Second, the court found, based on its inspection of the firearm, that it was implausible that a single bullet remained in the firearm after the others were ejected, such that the gun was loaded with one shell when A.F. handled it. Third, the court found that Quinto-Pascual's testimony was incredible and that his conduct after the shooting was incriminating. Finally, the court found credible the testimony of three prosecution witnesses who implicated Quinto-Pascual. Each witness testified that Quinto-Pascual made statements that suggested or directly conveyed that he shot A.F. On appeal, Quinto-Pascual complains that each of these findings was erroneous.

Quinto-Pascual first takes issue with the court finding it unlikely that the gun was within inches of A.F.'s head. He concedes that the gun was not pressed against A.F.'s head, but argues that the testimony of Dr. Dennis Firchau, the expert who performed A.F.'s autopsy, established that the gun "could have been closer" than inches. Although Dr. Firchau concluded that the range of fire was "indeterminate," the court's finding was rooted in Dr. Firchau's testimony on the absence of searing, muzzle imprint, stippling, lacerations, or blowback of biological material. It is

undisputed that these phenomena were not present, and we see nothing unreasonable and impermissible in the court's findings.

Dr. Firchau testified that muzzle imprint occurs when a gun is fired in contact with skin, leaving an impression from a scrape or the blunt force of the gun. Searing results when a closely held gun releases gases that burn the victim's skin, and lacerations appear when gases lift up and tear the victim's skin. Blowback occurs when biological material, such as blood, is flung back onto the gun. Dr. Firchau testified that blowback is found in three-quarters of shootings at close range, and Officer Brice Lippert, an investigator, testified that the lack of blowback ruled out a self-inflicted shooting. That these effects were absent supports the finding that the gun was not in "very close proximity" to A.F.

The absence of stippling supports the finding that it was unlikely that the gun was within inches of A.F. Stippling appears when unburned gunpowder particles penetrate the skin around a wound. Dr. Firchau testified that stippling occurs if a gun is fired between a distance of one centimeter and two to three feet away from the victim. He also testified that in a "typical" case, stippling should be seen if the gun was held four inches from the victim. Quinto-Pascual asserts that hair surrounding the wound might have prevented stippling, but Dr. Firchau testified that it would be "still quite typical" to find stippling "even in parts of the scalp that are covered with hair."

To overcome this evidence, Quinto-Pascual points to the presence of soot. Dr. Firchau testified that soot is a fine powder that forms when a gun is fired, and it can appear around a wound if the gun is within twenty to thirty centimeters from the victim. Soot can also be deposited from farther away, however, if a bullet travels through a dirty muzzle of a gun, picks up the soot, and leaves the soot around the wound and through the path of the wound. Dr. Firchau found soot-like material around the wound and in the wound's path, so the presence of soot was inconclusive

on the issue of distance. With "two permissible views of the evidence" available, there was no clear error. *Anderson*, 470 U.S. at 574.

Quinto-Pascual argues that the court erred by relying on the bullet's trajectory. We disagree. Dr. Firchau opined that the trajectory was right to left, back to front, and upward, but testified that it was "difficult to speak on" whether the shooting was self-inflicted. Officer Lippert, however, demonstrated how A.F. would have been required to hold the gun in order to shoot himself. Lippert testified that it was not a "comfortable natural position" and would become more uncomfortable as the distance increased between gun and head. The court permissibly credited Officer Lippert's testimony in finding that it was improbable that A.F. "contorted his body" in order to keep the gun "a fair distance from his head and yet shoot himself."

Quinto-Pascual argues that the court improperly "qualified itself as a firearms expert" when it rejected his theory that a bullet might have stuck in the gun when he attempted to clear it before handing the gun to A.F. Quinto-Pascual's testimony was the only evidence that the gun's ejection mechanism was defective. Although Officer Lippert testified that he did not check whether the mechanism worked, he demonstrated how the gun ejected bullets. He also testified that personnel at a laboratory test-fired the gun and did not report any issues with the mechanism.

After this testimony, the court inspected the gun and observed that there was "a single mechanism that ejects all the shells at the same time, and there's no obvious to me defects in the semicircles that would have captured the rings on the bottom of the bullets." The court gave counsel the option to "reexamine the firearm or . . . ask any questions in light of my observations." Quinto-Pascual asked no additional questions on the mechanism, and he never contested the court's observations. The court then found that "the ejection mechanism of the weapon strongly suggests that if there was a defect, it would have affected the ejection of all the shells, not just one." On appeal, Quinto-Pascual does not identify any persuasive evidence to the

-6-

contrary. The court did not clearly err by rejecting Quinto-Pascual's testimony on the firearm.

Quinto-Pascual argues that A.F. might have loaded the gun himself. The court did not clearly err in rejecting this theory. Officer Lippert testified that the gun involved in the shooting was complex, and that even with knowledge on how to "rip it open," a person inexperienced with firearms would not have been able to load the gun correctly and shoot himself within a matter of seconds. A.F.'s girlfriend, K.J., testified that A.F. was inexperienced with firearms and "did not feel comfortable around guns, period."

Quinto-Pascual next points to the fact that A.F.'s DNA was found on the trigger of the firearm. The district court reasoned that the DNA did not alter its finding because Quinto-Pascual "easily could have let the victim handle the gun . . . and still shot the victim." Although Quinto-Pascual disagrees with this reasoning, the district court's finding was a permissible view of the evidence and thus not clearly erroneous.

Quinto-Pascual finally challenges the district court's credibility findings. He contends that the court erroneously discredited his testimony, and erred in finding that K.J. and the other prosecution witnesses were credible. Credibility determinations are virtually unreviewable on appeal, *United States v. Tunley*, 664 F.3d 1260, 1262 (8th Cir. 2012), and credibility is "not an all-or-nothing proposition." *United States v. Cassidy*, 6 F.3d 554, 557 (8th Cir. 1993).

The district court found that Quinto-Pascual's testimony was "halting and appeared calculated." The court observed that the defendant "correct[ed] himself multiple times" and "repeatedly glanced at the Court during his testimony," consistent with the actions of one who was "spinning a yarn and trying to see if the audience

was buying it." The court observed the defendant testify and thus had a comparative advantage in evaluating his credibility. We see no clear error.

Quinto-Pascual argues that the district court improperly found that his changing explanations to the police, his hiding of the gun under a car, and his delay in calling police were incriminating. He emphasizes that he was under a "great deal of stress" after the shooting, but claims that he testified truthfully at sentencing. The court acknowledged Quinto-Pascual's argument, but found that the evidence showed an attempt to hide a murder. Officer Lippert testified that a person would have to lie prone to place the gun under the car, and the court reasoned that Quinto-Pascual's initial decision to tell police that he "kicked" or "threw" the gun was an attempt to avoid explaining that he carefully hid a murder weapon. The court explained that the delay in calling police suggested that the defendant was "plotting" a story that "the victim shot himself." The court also observed that Quinto-Pascual initially denied owning the gun, then claimed that the gun was on loan from another party, and finally admitted that he traded methamphetamine for the gun. The court noted that despite the defendant's contention that A.F. showed him a methamphetamine pipe, a pipe was never recovered from either person. The court gave cogent reasons for disbelieving Quinto-Pascual's testimony, and it was not clear error to reject the innocent explanations.

Quinto-Pascual contends that the district court's credibility determination was based in part on an erroneous finding that fourteen minutes elapsed between the time when he left the bar and when he appeared at the home of J.C. and S.M. The court found it "highly unlikely" that the string of events described by Quinto-Pascual could have "occurred in such a compressed period of time." Officer Lippert determined based on two videos—one taken inside of the bar and one recorded outside of the house—that Quinto-Pascual left the bar no earlier than 12:35 a.m. and appeared at the house at 12:49 a.m. He testified that although the time stamps on the videos were

-8-

inaccurate, he was able to calculate the correct times. There was no clear error on this point.

The district court also did not err in crediting K.J.'s testimony that Quinto-Pascual and A.F. knew one another before the night of the shooting. Quinto-Pascual points out that K.J. was incorrect that A.F. did not use methamphetamine, and the defendant suggests that K.J. might have picked him out of a photo array after seeing a news article with his picture. K.J. denied reading an article on the shooting, and her testimony that A.F. never used methamphetamine does not undermine the court's decision to credit her testimony that A.F. and Quinto-Pascual were acquaintances.

The district court permissibly found credible three prosecution witnesses—J.V., L.T., and C.S. Quinto-Pascual attacks the credibility of the witnesses on various grounds: J.V. and L.T. were incorrect about where the firearm was found and the crimes charged against Quinto-Pascual; L.T. was incorrect about where Quinto-Pascual was located when he called the police; and the three witnesses contradicted each other on whether they discussed the case among themselves. The court credited the witnesses' testimony because they did not provide "exaggerated testimony," two of the witnesses—L.T. and C.S.—did not seek "the authorities to trade their information," each witness was "consistent in general terms about [Quinto-Pascual's] involvement in the drug trade," and "all three knew where the victim had been shot," even though that was not public information. There was no error in this reasoning, and Quinto-Pascual's arguments do not show that the testimony was "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575.

In sum, the court did not clearly err in finding that Quinto-Pascual shot A.F. Taken as a whole, the forensic evidence, expert testimony, and lay witness testimony were sufficient to support the court's finding and its corresponding application of the sentencing guidelines. The judgment of the district court is affirmed.

_____